TONKOVITCH *v.* INDIANA MINING CO.

1. MASTER AND SERVANT—APPEAL AND ERROR—EVIDENCE—PRESUMPTIONS.

On writ of error to review a verdict and judgment for defendant under the direction of the trial judge, the evidence must be considered in the light most favorable to appellant, who is entitled to have any legitimate inferences drawn in his favor.

2. SAME—SET SCREWS—PROXIMATE CAUSE.

Evidence, in an action for injuries sustained by a servant while engaged in oiling machinery in defendant's factory, *held*, to present an issue for the jury, whether his injury resulted from an unguarded set screw striking his hand, forcing it against the revolving saw.

3. SAME—BURDEN—EVIDENCE.

He was not required to exclude the possibility that his injury might have occurred in some other way, but was entitled to recover if his proofs satisfied the jury, by a fair preponderance of the evidence, that it took place as he alleged and claimed.

Error to Ontonagon; Cooper, J. Submitted November 16, 1914. (Docket No. 53.) Decided July 23, 1915.

Case by Joseph Tonkovitch against the Indiana Mining Company for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Reversed.

*Le Gendre & Driscoll,* for appellant.

*Allen F. Rees* (*Deen L. Robinson* and *A. E. Petermann,* of counsel), for appellee.

STEERE, J. Plaintiff, a native of Croatia, 31 years of age, by trade a mason, was injured on August 16,

1911, while engaged in oiling machinery in defendant's sawmill near its mine in Ontonagon county. Imputing his injuries to defendant's negligence, he instituted this action to recover damages therefor in the circuit court of said county, where the trial resulted in a judgment for defendant upon a directed verdict.

Defendant was developing and operating a copper mine, called the "Indiana," and as an adjunct built and equipped a sawmill close by, used and managed in connection with the mine. The general superintendent was a Mr. Bennett, who hired plaintiff at Houghton and sent him to the Indiana mine location to work at plastering a shaft and other mason work. After working for a short time as a mason upon the shaft, he was informed conditions were such that this work must wait until frost came in the fall, when they would start again, but in the meantime he could have other employment around the location. This he accepted and was put at common labor, with occasional short jobs of mason work. Among other things, he assisted the carpenters in their work upon this sawmill, where he was injured, which was in process of construction, and also in installing some of the machinery in it, including the engine. One Gilbert Mead, the foreman machinist and master mechanic at the mine, was superintending the erection of the sawmill. He had full charge and control of all machinery and men employed in that connection, with power to hire and discharge them. It was his general duty to look after, install, and keep up the machinery of the company, see that it was in proper condition and reasonably safeguarded for those operating it under his directions, instruct them how best and most safely to do their work, and to warn them of special dangers connected with their employment.

While helping in its construction, plaintiff had been under Mead's orders, and, when the mill was ready

to start, Mead directed him to go to work there as oiler and watchman of the machinery; one of his assigned duties also being to start and stop the engine, which, supplied with steam from the main boiler house, only required opening and closing a valve. Plaintiff at first demurred, stating that he was not an engineer, had no experience in working around machinery, and knew nothing of it, but, on assurances and a promise by Mead to instruct him, he acquiesced. Mead in that connection testified plaintiff was subject to and bound by his orders, and he put him at this work, as he had authority to do. The mill was first operated on the afternoon of August 15th. After starting it, Mead showed plaintiff how to oil the machinery and turn the valve to stop and start the engine. There were at least 10 different places where the bearings required oiling. Mead testified that he showed plaintiff how to oil one bearing at a place where it was not dangerous to oil while the machinery was in motion, and also said in part:

"I told him to stop the engine and oil the bearings and not go in around the belts while she was running. * * * At some of these places it was not dangerous to oil while the machinery was running, and at others it was dangerous. * * * I didn't tell him not to oil the bearings while the machinery was in motion. I told him not to go in among the belts while the engine was running. I didn't tell him anything about the oiling of that box (where plaintiff was injured). I never spoke about that. I told him not to go in behind the belts. * * * I knew he was inexperienced in working around machinery. * * * I admit that it was dangerous to oil at the particular place, where plaintiff was injured, while the machinery was running."

Plaintiff testified that, in answer to his inquiry, Mead told him not to stop the machinery to oil up as it would take too much time, but to do the same way as he (Mead) did, and then oiled the machinery him-

self while it was running, showing plaintiff "every place to oil all around," but gave no warning of any particular danger; that plaintiff oiled the machinery that afternoon, but in the morning, when Mead started the mill, told him that he had no experience at that work and did not wish to stay, and Mead said, "Go down there and stay until we find an experienced man in your place," and again oiled the machinery while it was running to show him how and where. Plaintiff thereupon remained until he was injured, about three hours later, while oiling a bearing below the floor of the mill in a confined and poorly lighted place near a circular saw projecting partly below the floor. Mead states it was not very light anywhere in that place, but light enough to see the bearing and place to oil; and to get there it was necessary to crawl around behind or in front of the engine. The place to stand in while oiling was narrow with a bank of earth on the left and a belt on the right, with a large fly-wheel nearby. The circular saw coming through the floor was 12 inches from the shaft, the bearing of which plaintiff was oiling, and 3 or 4 inches to one side of a set screw projecting about three-fourths of an inch out of this revolving shaft. The fly-wheel, belt, saw, set screw, and shafting were not safeguarded in any manner. Shortly before the accident, Mead came down from the mill above and asked plaintiff if he had "oiled it up," and, being answered that plaintiff had just done so, told him to go around again and oil up the machinery "and watch him good." Plaintiff, in obedience to this order, started around to oil the different bearings again and, at the place of injury just described, while in the act of oiling the bearing, his left hand was thrown against or came in contact with the saw and was seriously injured, causing the loss, in part or in whole, of three fingers. Plaintiff was alone when the accident occurred, and his testimony was to

the effect that something, he could not tell what, struck his hand and threw it against the saw.

While plaintiff's declaration alleges numerous duties and breaches of duty on the part of defendant, including failure to countersink or otherwise guard the set screw which projected from the revolving shaft, both in his counsel's opening statement and during the progress of the trial the proximate cause of injury was claimed to be the set screw striking plaintiff's hand while he was busy oiling the adjacent bearing and causing it to come in contact with the saw.

The only direct testimony to the circumstances of the accident was necessarily that of plaintiff, no one else being present, and he did not testify in exact language that the set screw caused the injury. He testified that he then had no knowledge of any set screw being there, did not know what a set screw was, and only knew something struck his hand.

At the conclusion of the evidence, defendant's counsel moved for a directed verdict in its favor on the ground that plaintiff's testimony failed to show directly or by any permissible inference that his hand came in contact with this set screw, that the proximate cause of the injury was mere conjecture, and no *prima facie* case was made. This motion was at first denied, but subsequently granted; the court in directing a verdict saying, in part:

"There is no inference that the jury could draw to the effect that his hand was caught by the set screw or shaft; and inasmuch as counsel say they must rely on that to recover, and inasmuch as the plaintiff swears positively that his hand did not catch in the shaft or set screw, there is certainly nothing which could form a basis for a verdict in favor of plaintiff. He is very positive at all times that his hand remained as illustrated, from 6 to 8 inches or more from the shaft or set screw. He is very positive that his hand did not get any closer than that."

We have searched the record in vain to verify the statement that plaintiff swears his hand did not catch in the shaft or set screw. His repeated and consistent answer was that, while standing close to the shaft oiling the bearing, something hit his hand, and it went against the saw. While those present at the trial might have gathered from his illustrations impressions varying from those conveyed by his evidence found in the record, his proximity to the shaft when the accident occurred is clearly, upon the record, a question of fact. He was examined and cross-examined at length upon the subject. The following excerpts from his testimony well serve to indicate the tenor of his answers:

On direct:

"*Q.* Where was your hand with reference to the set screw at the time your hand was struck when you were injured?

"*A.* I held my hand like that. I had the oil can in this hand (indicating).

"*Q.* How close would your hand be to where the set screw was?

"*A.* It must be pretty close, because there isn't much space. * * *

"*Q.* When you said you had to go there like that, you indicated sideways?

"*A.* Yes, sir. That is the way Mr. Mead showed me how to oil that place, and I just do it the way he did himself. I did not know there was a set screw there at any time before I was hurt. I did not know there was anything there on or around the shaft that would be liable to strike my hand and knock it against the saw. * * *

"*Q.* About where did that thing strike you when your hand was knocked against the saw when you were hurt?

"*A.* About in here (referring to outside of left hand). I don't remember just exactly how my fingers were at that time. I didn't know of any better or safer way of doing the work than the way in which

I was doing it at that time.  *  *  *  It ain't very light.  You have got the light only from one way."

On cross-examination:

"It was while oiling in that way that my hand got caught.  I was oiling and standing like that (indicating).  Something struck my hand like that (indicating).  My right hand like that (extending right hand). My left hand was down alongside of me, hanging down alongside of my body.  Then my hand got struck by something.  *  *  *  My right hand ain't very far from my left hand, I guess.  I don't know if it is a foot.  I can't remember.  I was facing this shaft that was running there.  I was facing it squarely.  The right side of my body wasn't any farther away from it than the left.  My left hand was hanging down in front of my body, and my right hand was extended to oil the shaft.  *  *  *

"Q. Stand up next to the railing and put your hand out about the way you were, so that we can tell.

"A. I don't remember exactly, but I know it was close to the shaft.

"Q. Suppose the top of this railing was the shaft; now stand up and show how you were oiling the shaft.

"A. I oiled it up.  I don't know whether I held my hands way down, but I know I was close to the shaft. *  *  *  I was standing like that when I oiled up (indicating by standing up near railing).  I was close to the shaft.

"Q. About as close as you are now?

"A. Yes, I was close to the shaft.  *  *  *

"Q. You were about 6 or 8 inches from the shaft?

"A. I can't tell you exactly.

"Q. That is about the way you are now?

"A. Something like that.  I can't tell you exactly.

"Q. Couldn't you stand back farther and oil the shaft?  *  *  *

"A. There is no place to stand back.  There is a pretty small place to stand.  *  *  *

"Q. You were standing right in front of the shaft?

"A. Yes, close to the shaft.  *  *  * "

During his grilling cross-examination plaintiff plainly and repeatedly stated he did not know and de-

clined to venture any positive assertion as to just how far he was from the shaft, but reiterated that he was close to it. He was engaged about his work oiling a bearing of that revolving shaft containing a set screw of which he was ignorant, within 3 or 4 inches of the bearing, while the circular saw of which he knew was a foot away. That he moved more or less while at his work and in avoiding proximity to the saw, a known danger, he kept closer to the shaft and revolving set screw, an unknown danger, is a natural conclusion in harmony with his testimony. In *Hackett* v. *Manufacturing Co.*, 101 Mass. 101, it was said:

"It can hardly be expected that workmen will not move a little while they are engaged about their work; and, if they are exposed to danger from defective machinery of which they are unaware, the question is whether they were in a position such as, without carelessness, they might be reasonably and naturally expected to occupy, and not improper for a person so employed. This is a question of fact, under all the circumstances of the case, and not of law."

Upon the grounds stated by the court in taking the case from the jury, we think plaintiff's testimony is at least susceptible of a different interpretation than that given it by the court, and therefore should have been submitted to the determination of the jury. *Stevens* v. *Pendleton*, 85 Mich. 137 (48 N. W. 478).

We think the evidence puts the question of proximate cause, as claimed by plaintiff, sufficiently within the bounds of reason and common experience to demand its submission to the jury. In entering upon that inquiry, we start with abundant direct evidence of negligence on the part of defendant in failing to take proper precautions for guarding this machinery against the danger which confronted plaintiff and which would naturally result in such an injury as occurred, as also failure to sufficiently instruct and

187 Mich.—13.

warn an ignorant and inexperienced employee. A verdict having been directed against plaintiff, the evidence must be considered in the light most favorable to him and all legitimate inferences from it drawn in his favor.

The fact not directly testified to and sought to be established as the proximate cause by circumstantial evidence is that the set screw struck his hand and caused it to come in contact with the saw. It is fairly shown that he naturally would stand closer to the set screw than the saw. He knew the danger of the latter and did not know of the former. Mead testified they were the two things which might strike his hand while oiling. He states in that connection:

"I knew he was inexperienced in working around machinery. * * * That machinery, when it revolves, revolves pretty fast, so that, when the shaft was revolving, the set screw wasn't visible. You couldn't see it. That is a fact. And if the set screw struck his hand it would be liable to knock his hand against the saw. It is liable to injure him. It is liable to knock his hand against the saw. * * * The set screws can be countersunk. When they are countersunk they are not as liable to strike the hands or clothing of persons, as when they stick out. * * * It was entirely practicable to put in a countersunk set screw at that place. * * * There was nothing else around that place to strike a person's hand but the set screw and the saw. * * *

"Q. The saw was some distance away?
"A. Yes. (Witness elsewhere testified 12 inches.)
"Q. There was nothing near the shaft but the set screw to strike the person's hand?
"A. No, sir.
"Q. When the set screw did strike a person's hand it would strike pretty hard; it was going pretty fast and it would strike it a pretty hard blow?
"A. I should naturally think it would, although I was never struck. * * * If it struck him it might drive him in any direction."

This is not a question of whether the trial court

drew a proper inference, or what inference should be drawn from the circumstances in proof, but whether the jury as intelligent men, reasoning from the evidence to a conclusion upon the ultimate fact for them to decide, might legitimately conclude from all the facts and circumstances proven that the injury occurred as plaintiff alleged and claimed at the trial. *Mumma* v. *Railway Co.,* 73 N. J. Law, 653 (65 Atl. 208).

In *Lunde* v. *Packing Co.,* 139 Iowa, 688 (117 N. W. 1063), the court said upon the question of proximate cause that a plaintiff "is not bound to exclude the possibility that the accident might have happened in some other way, for that would be to require him to make his case beyond a reasonable doubt. He is only required to satisfy the jury, by a fair preponderance of the evidence, that the injury occurred in the manner he contends it did"—citing numerous cases, including *Schoepper* v. *Chemical Co.,* 113 Mich. 582 (71 N. W. 1081), where this court stated the rule in different, but equally plain and strong, language.

We are satisfied, from a review of the evidence in this record, that whether plaintiff's theory of the inferences to be drawn from it as to the main fact is the correct one was a question for the jury.

The judgment is accordingly reversed, and a new trial granted.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.