JAMES EVERETT FONDA ET AL., EXECUTORS, APPELLEES, V.
NORTHWESTERN PUBLIC SERVICE COMPANY, APPELLANT:
EDITH SMITH, ADMINISTRATRIX, APPELLEE.

292 N. W. 712

FILED JUNE 14, 1940. No. 30811.

*Hoagland, Carr & Hoagland, William Suhr* and *Dana Van Dusen,* for appellant.

*Shuman & Overcash* and *Beatty, Maupin, Murphy & Davis, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

MESSMORE, J.

Nellie L. Fonda during her lifetime brought this action against the defendant corporation and its superintendent in charge of installation, inspection and distribution of its natural gas service for alleged injuries, claimed to be due to carbon-monoxide asphyxiation, on December 19, 1933, from a convertible gas burner, placed in a Green Colonial furnace, ordinarily used for burning solid fuels, and owned by James H. Fonda and his wife Nellie. The case proceeded in the name of the executors of her estate. The jury returned a verdict for the plaintiffs in the amount of $5,000 and dismissed the action as to the defendant superintendent. Defendant Northwestern Public Service Company appeals.

Plaintiffs' amended petition alleged facts constituting

negligence on the defendants' part in the installation of the gas burner, in failing to strap the clean-out plug at the time of the installation in 1932, and in failing to properly and thoroughly inspect the furnace on December 17, 1933. Defendants' answer contained a general denial and, in addition, alleged the purchase by the Fondas of the convertible gas burner in September, 1932; that the installation was made in a safe, workmanlike manner, in accordance with the standard rules of installation of Sonner burners, and, when completed, was satisfactory and ready for use; and alleged contributory negligence. The reply was a general denial.

The evidence discloses: The defendant public utility corporation was engaged in the installation and servicing of gas and heating equipment and selling, delivering and furnishing of natural gas. Elmer H. Smith was its superintendent in charge. James H. Fonda, a retired railway engineer, and his wife, aged 75 and 74 years, respectively, lived in North Platte for many years. Mr. Fonda investigated the cost of installation of a gas burner in his home. Pursuant to an agreement, on September 10, 1932, a Sonner heating machine was installed in the Green Colonial furnace owned by the Fondas. The installation was checked and approved by the superintendent September 26, 1932, and accepted.

On December 17, 1933, Edna Hall, employed as a maid in the Fonda home from August, 1933, until December 17, 1933, and in charge of the home at the time, during the absence of the Fondas who were visiting in Omaha, was awakened by a noise which she described as sort of a puff, as if "something had dropped on the floor;" the noise "was louder than usual, it sounded more like the back-fire of a car," as if a "lid had dropped on the floor," and the house became cold. She called on the telephone for Clarence Molley, who was and had been for ten years a service employee of the defendant company, in the capacity of "trouble shooter" or utility man; talked to Mrs. Molley, telling her she felt there was something wrong with the furnace. Mr. Molley came to the house about 11 o'clock the same morn-

ing, and the maid told him she thought the burner was out. They both went to the basement. Molley opened the front door of the furnace, looked into it, found the pilot light out, the burner not operating; he started the pilot light, adjusted the valves, and looked at the thermostat. The maid was unacquainted with the operation of the furnace. She did not see Molley go around to the back of the furnace. Molley testified that after finding the pilot light out he closed the main gas valve and closed the pilot valve and the main burner valve; then waited for the furnace to air out, to be sure no gas would escape from the pilot light; turned the valves on again and started the pilot light. He discovered nothing wrong with the part of the equipment which he inspected; he did not go around behind the furnace, where the clean-out plug was located; he knew it was there; he participated in the installation of the burner; he was in the house between 20 and 30 minutes. Upon leaving he informed the maid that if the house did not warm up for her to call him. His conception of her statement to him is that the house was cold and she did not think the furnace was burning. She subsequently called and talked to Mrs. Molley on the telephone and told her the house was warming up. She noticed about noon that she was developing a headache and, while lying down reading, did become faint, nauseated and dizzy, and felt as if something heavy was pushing against her heart and lungs. She then called a friend, who came over and remained in the house with her until about 4 o'clock. Dr. Fetter was called and administered a sedative to the maid. The doctor testified that she had some symptoms of gas, and he went on the assumption that it was probably gas because they had trouble with the furnace. He advised them to get in touch with the gas men to see about it, placed the maid in a room, opened the windows and left. He thought she was subjected to some monoxide gas. She did not mention to the doctor that there was gas in the house; nor did she report to Mr. and Mrs. Fonda that she became ill from its effects. She was taken home by her father, was ill in bed, up and down, for several days,

and did not return to work at the Fonda home. When she left, the house was locked, remained closed and the furnace operating. The key to the house was given to neighbors by the name of Koons, living across the street.

On December 19, 1933, Mrs. Koons saw Mrs. Fonda when the Fondas returned home, and Mr. Koons delivered the key to Mr. Fonda and talked to him for a few moments. The next day the telephone company discovered that the receiver at the Fonda home was down and called the Koons home, requesting them to make an investigation. Mrs. Koons went over to the Fonda home, could not get in, returned and brought her husband and they obtained entrance by unlocking a screen. They found clothes disheveled and scattered about; there was evidence of bowel movements, and neither Mr. Fonda nor his wife was able to give coherent accounts of themselves. A doctor was called. Dewey Tarkington, a son-in-law, and his wife received a call from the Koons December 20, 1933, and in response went immediately to the Fonda home, arriving about 7:30 o'clock in the evening, found Mrs. Fonda in bed, delirious and apparently unable to recognize them. Mr. Fonda was in bed; his tongue was thick; he had difficulty in making himself understood and did not seem to comprehend what was occurring at the time.

A neighbor, Mrs. Fred Waltemath, having learned of the illness of Mr. and Mrs. Fonda, called between 10 and 11 o'clock the morning of December 21, and found them groaning and gasping for breath, and also found Mrs. Blanche Tarkington very sick, and Mrs. Waltemath noticed that the air in the house was offensive. She was there a short time in the afternoon when the air was not so bad and when the windows and doors were open. When she returned to her own home she called the gas company and said there must be gas escaping in the Fonda home and she thought it should be investigated. She saw some men from the company come almost immediately. A nurse, Janice Ryan, who was called on the case the night of December 20, became dizzy and was so nauseated that she was relieved by another

nurse. Miss Ryan remained in bed for two days as a result of her experience.

Dr. James E. Fonda, a son, arrived about January 2, 1934, and found his mother very ill. He testified she had difficulty in breathing, was weak, her pulse low; she was unable to get to her feet except with difficulty, complained of headache, lacked all control of her muscles, and had mental lapses. His father was very sick, complained of terrific pains in his chest and difficulty in breathing. His father died January 11, 1934.

Dr. O. R. Platt testified that he was called to the Fonda home December 20, 1933, treated the Fondas for food poisoning, and called a nurse to attend them during the evening. The next morning he called again, and because other people in the house had become ill, he thought there was a probability of gas poisoning and suggested opening the windows. He treated Mr. and Mrs. Fonda for four days, after which time he left North Platte for a vacation, and it was his opinion that when he left they had recovered. In answer to the question: "It is a fact that at that time they were suffering from the effects of gas, is it not?" the doctor replied: "That was my final opinion, that they had received some gas."

Dr. T. J. Kerr was called to the Fonda home one afternoon at about 5 o'clock to see Mr. Fonda, who was in the living-room on a couch; Fonda complained of pain in his stomach and of some nausea. The doctor made a diagnosis which showed "food poison or ptomain poison;" he treated him for such disease; there was no disarrangement in the house and no odor.

The record fails to show difficulty with bricks on the baffle plate, as claimed. The baffle plate is described as a flat, round, heavy disk, about 15 inches in diameter, below which the gas flames burn; it is used to deflect the heat toward the walls of the fire box. Evidence is lacking that the adjustment of the valves, or the heat-reclaimer, affected the operation of the furnace. This brings us to the inspection of the furnace and the effect of the clean-out plug being out.

Directly below the flue pipe of the furnace was a 10-inch pipe, about 15 inches in length, in the end of which was a clean-out plug, held in place by friction, created by crimpled edges, which fitted into this short pipe. The short pipe was connected with and opened into the furnace. The clean-out plug, when solid substances were burned in the furnace, could be removed in order to take from the furnace soot and other accumulations. When the installation was made, employees of the defendant company removed the clean-out plug, cleaned the pipe, put the plug back in place, but did not fasten it with screws or strap it. The manner in which the clean-out plug is placed is in controversy. Experts for defendant company testified the clean-out plug need not be fastened with a strap or held in place by screws, and an expert, who dealt in Green Colonial furnaces, so stated. The experts did testify that the clean-out plug should fit reasonably tight and be normally hard to pull out; that if the clean-out plug were removed it would lessen the air through the furnace 15 per cent. and, normally, there would be air and a sufficient amount of combustion as not to injuriously affect the operation of the furnace; however, if insufficient air were present carbon-monoxide gas would form in large quantities. The plaintiffs' expert testified that proper installation required screw fasteners to keep the clean-out plug in place; that installation of a clean-out plug, to permit it to be moved or put in place by hand-pressure, would be incorrect because of the danger of causing leaks in the gas plug opening, due to vibration or slight explosion, and if the clean-out plug was not in place there would be some leakage of the products of combustion from this opening.

Charles Gerkin, an employee of defendant company, whose duty it was to check furnaces and their operation, did, on December 22, pursuant to a memorandum dated December 21, 1933, go to the Fonda home to ascertain if there was a gas leak, and made what he termed a complete and thorough inspection. He found the clean-out plug on the floor close to the furnace and replaced it with his hands. He is reputed to have told Tarkington that the clean-out

plug. was all he could find and he thought that was the trouble, and made the remark that it seemed "to fit loose, it should be strapped in." This statement Gerkin denied, but he claimed that the furnace was operating properly; that there was a minus-pressure there to keep the gases from coming out. He was later called back to the house. Complaint had been made that some one had smelled gas and thought there was a leak. He could find nothing wrong on his second call.

Whether gas leaked or escaped through the opening left when the clean-out plug was out, or whether there was an explosion, is in controversy. Gerkin stated that he smelled no gas, and was likewise positive that gas did not escape through the opening. Experts testified that, if the clean-out plug was removed, normally the products of combustion would come out in the basement in an instant or two, but almost immediately a draft would be created, and the gases would be carried back into the flue. When the clean-out plug would first be pulled out, gas which would escape would not be in sufficient quantity to be dangerous. The plaintiffs' expert testified that the tendency of gas to escape through the clean-out plug opening would be increased, and that some gases would escape which contained carbon dioxide, nitrogen, a small per cent. of monoxide gas, a small quantity of oxygen and water vapor; that the gases in the basement would permeate through the house, and carbonmonoxide gas which may escape is very poisonous; that with the clean-out plug down the gas would be reduced somewhat more, causing incomplete combustion.

On December 22, Howard C. Hopkins, manager of the defendant company, came to the Fonda home and talked to Mrs. Tarkington, who testified: "I told Mr. Hopkins how the folks were and I asked him about the furnace, and he said, we have located the trouble, found the difficulty, and everything has been fixed, and the plug has been put back and you will have no more difficulty." In exhibit 38, purporting to be Hopkins' testimony, such conversation is denied. It is true that when the clean-out plug was replaced

and the house aired no further trouble was experienced from the effect of gas, and it is likewise true that from December 17 until December 21 every one who stayed in the house during this period became ill.

Natural gas, in its raw state, does not contain carbon monoxide; it is produced by imperfect, or partially imperfect, combustion. More than two-tenths of 1 per cent. of carbon-monoxide gas is dangerous. There is a very small trace in all flue gases, and the amount of carbon monoxide depends upon the operation and condition of the unit and the combustion. Ordinarily, the operation of furnaces is the same, either with gas or coal. There are contributing factors to heating; the draft through a flue pipe is affected by many things, including atmospheric conditions and trees about the house, and no person knows what gases will do in all cases. Persons who inhale carbon-monoxide gas develop a severe headache and throbbing in and near the temple, followed by nausea, vomiting and dizziness, also by complete relaxation of the muscles controlling the bladder and lower bowels. Dr. Platt testified: Ordinarily, gas poisoning needed no treatment; merely to remove the cause and give the patient air was sufficient; Mrs. Fonda had some monoxide poisoning; however she had recovered. The positive test for carbon-monoxide poisoning is a blood test, which was not taken.

Much conflict arises as to the general health of Mrs. Fonda prior to the accident, and whether or not she suffered any damage by being injured by carbon-monoxide poisoning, if such be the fact. Dr. Stokes testified she had always been a very frail woman and was brought to his office most of the time by her husband. The doctor saw no change in her condition from December 16, 1933, and in April, 1934, and again when he saw her May 21, 1934, when she complained of being dizzy and that her glasses had not been properly fitted by him. Dr. Platt's testimony discloses that on April 14, 1932, Nellie Fonda was suffering from a number of physical ailments. In his opinion she died of chronic Bright's disease, arterio-sclerosis and hyper-tension which

was progressive, and probably died in a uremic coma; and the illness, which she had when he attended her for three days, was not connected in any manner with her death, and she probably lived her expectancy under the circumstances.

The evidence of the neighbors of the Fondas, of Dr. James E. Fonda, Blanche and Dewey Tarkington, was to the effect that, up to the time Mrs. Fonda went through a night and day of suffering when she was asphyxiated, she was a spry, wiry woman for her age, did housework and cooking, took trips and enjoyed life generally; that subsequent to the asphyxiation she suffered lapses of memory, becoming mentally unbalanced at times. When taken to the hospital she was found to be in such a mental state that she could not be treated there; from and after her injury she could not be left alone for more than a moment, but needed a constant watch; she remained in this pathetic condition for about eight months, and died on August 17, 1934.

In the case of *Fonda v. Northwestern Public Service Co.,* 134 Neb. 430, 278 N. W. 836, this court held: "When a gas company engages in the distribution of natural gas and the installation and inspection of its equipment, it is incumbent on such company to exercise the high degree of care and diligence required in the handling of a dangerous commodity, and, if negligent, it is liable therefor."

In 28 C. J. 591, 592, 593, it is said: "While no absolute standard of duty can be prescribed, it may be said, in general terms, that every reasonable precaution suggested by experience and the known danger of the escape of gas ought to be taken. This requires, in the case of a gas company, * * * that it shall maintain an efficient system of inspection, oversight, and superintendence * * *. A gas company must use due and reasonable care in the inspection of its pipes, to insure reasonable promptness in the discovery of leaks that may occur from defects in or deterioration of pipes and valves, from careless or wrongful meddling with its works on the part of others."

The appellant contends that an action for negligence may not be predicated on an inference drawn from an inference,

if the negligence is only supported by an inference and circumstantial evidence; such inference must be supported by some fact established by direct evidence, or the claim of negligence will fall; that the case of *Mischnick v. Iowa-Nebraska Light & Power Co.*, 125 Neb. 598, 251 N. W. 258, is analogous to the instant case; that each is an explosion case, and that in the *Mischnick* case an explosion was proved by undisputed evidence; that in the instant case the blowing out of the clean-out plug was merely the effect of the explosion; that plaintiffs' case rests upon the fact of explosion and there is no direct evidence that an explosion occurred.

As we view the case at bar, the testimony shows that defendants made the installation according to their own plans, shows further that the clean-out plug may not have been properly installed, and likewise points to this as the source of asphyxiation, and that the clean-out plug constituted the trouble. It dropped out December 17 and remained out until December 21. There is nothing in the record to show any other means by which gas could escape than through the opening left when the clean-out plug fell out. A company, engaged in the maintenance of such a dangerous fuel commodity, must have employees efficient in their line, and it is bound to anticipate injuries resulting from the use of such commodity. The Fondas had a right to trust the workmanship and service and rely exclusively upon the company's knowledge and skill in the installation and inspection of gas burners and equipment. The cases are distinguishable.

From September, 1932, until December, 1933, superintendent Smith and other employees made various calls at the Fonda residence, some of them in response to requests for inspection and others on routine inspection. Molley inspected this furnace when called by the maid December 17. He was an expert. The maid would not be required, under the circumstances, to give him notice of a defect of which she was unaware. Having undertaken this inspection, it was the duty of the employee to exercise ordinary care in

making such inspection and to effect any necessary repairs, or inform the tenant or owner of the defects and afford him an opportunity to make such repairs. See 28 C. J. 594. It is true that the company is not required to keep up a constant inspection, but when its attention is called to the trouble and it undertakes to remedy it, then, where there may be grave danger, the inspection should be thorough and efficient. Molley failed to make a thorough and efficient inspection on December 17. He assumed that he had found the trouble and that it had been remedied. From the time that its employee, acting under its direction in making the inspection, assumed that the trouble had been remedied, the liability of the company attaches.

The cause of an accident, like any other factor, may be proved by circumstantial evidence. Here, sufficient cause of the accident was shown, and the circumstances strongly indicate that it was the real cause. See *Sweeten v. Pacific Power & Light Co.*, 88 Wash. 679, 153 Pac. 1054.

In the case of *Tonkovitch v. Indiana Mining Co.*, 153 N. W. 811 (187 Mich. 186), it was held: "A plaintiff is not bound to exclude the possibility that the accident might have happened in some other way, but is only required to satisfy the jury, by a fair preponderance of the evidence, that the injury occurred in the manner claimed." And in *Markussen v. Mengedoht*, 132 Neb. 472, 272 N. W. 241, it was held: "Where facts and circumstances are established from which the manner of sustaining injuries can be logically inferred, an issue is presented for the jury."

This court held in *Fonda v. Northwestern Public Service Co., supra*: "Liability for injuries caused by escaping gas does not depend on notice of defect, where defect is due to improper or careless installation and inspection."

The appellant predicates error on certain instructions given by the trial court on its own motion and instructions tendered by defendants and refused. The court did not instruct on contributory negligence, and the evidence fails to show contributory negligence on the part of Nellie L. Fonda. In this respect the court did not err.

Instruction No. 17A, given by the court, is objected to. This instruction is identical with instruction No. 12A requested by defendants. Defendants claim that instructions 5 and 6, offered and refused, were necessary and incident to the subject-matter contained in instruction No. 17A. We have examined the instructions here criticized and, without setting them out, conclude that instruction No. 6 withdraws from the jury the question of recovery for damages from asphyxiation. Instruction No. 5, in view of all of the other instructions given, was properly refused, as the subject-matter of such instruction is contained in other instructions. The following authorities are pertinent:

"If a party to litigation requests the giving of an improper instruction, he will not be permitted to predicate error thereon. A party will not be heard to complain of an error which he himself invited." *Day v. Metropolitan Utilities District*, 115 Neb. 711, 214 N. W. 647.

" 'Where a requested instruction is refused by the trial court, but the court embodies the same idea in an instruction given upon its own motion, the party requesting such instruction having suggested it to the court will not be heard to complain that it is erroneous.' *Vorce v. Independent Telephone Co.*, 86 Neb. 27, 124 N. W. 836." *Kovar v. Beckius*, 133 Neb. 487, 275 N. W. 670.

Objection is made to instruction No. 18, setting forth the elements the jury may consider in awarding damages to the plaintiffs, if plaintiffs are entitled to recover. We agree with this instruction, with the exception that it permits recovery for funeral expenses, shown by the evidence to be in the sum of $369. Plaintiffs failed to prove by a preponderance of the evidence that the death of Nellie L. Fonda was caused by carbon-monoxide gas poisoning, resulting in asphyxiation.

We have examined all of the instructions offered and given and conclude that the instructions given, considered in their entirety, fairly and adequately state the law and are not prejudicial. See *Clausen v. Johnson*, 124 Neb. 280, 246 N. W. 458; *Kovar v. Beckius, supra*.

Error is predicated in that the evidence is insufficient to warrant the submission of the case to the jury, or to sustain the verdict. This has required a detailed statement of the evidence, together with the apparent conflict therein. From an analysis of all the evidence, we conclude that it was proper for the trial court to submit the case to the jury.

Appellant further contends that the verdict in favor of defendant Smith, its superintendent in charge of installation and supervision of gas equipment, releasing him from liability, likewise released defendant company, because the plaintiffs' claim of negligence is based upon the failure of defendant company, its agents or employees to fasten or strap the clean-out plug in place, and since the installation was in charge of Smith and he was absolved from all blame, then there is no faulty or negligent installation and, therefore, no negligence on the part of the company.

In this connection, the record discloses that defendant Smith and the employees assisting him in the installation of the convertible gas burner were working under the direction of the defendant company by work ticket. The evidence is not clear as to which one of the employees placed the clean-out plug and failed to strap or fasten it. The record further discloses that at the time of the inspection by Molley on December 17 and the events occurring from and after such time, including December 21, defendant Smith was not present at and had nothing to do with such inspection.

A jury may properly return a verdict in favor of a servant and against a master, where the evidence supports the finding of other negligence chargeable to the master than that of the servant exonerated by the verdict. This, of course, is dependent upon the facts as determined by the testimony in the case. *Curtis v. Puget Sound Bridge & Dredging Co.*, 133 Wash. 323, 233 Pac. 936. The cases cited by the appellant are pertinent when it is shown that the negligence of the employee is the only negligence charged against the defendant. However, where the evidence dis-

closes negligence on the part of other employees of the defendant company, not parties to the litigation, then the principle as contended for by appellant does not apply.

Corpus Juris, after stating the rule contended for by appellant, continues thus: "If the liability is not so based, a finding that the act of the particular servant was not wrongful does not prevent the rendition of a verdict against the master based on the acts of other servants shown to be wrongful and for which the master is liable on the doctrine of respondeat superior." 39 C. J. 1368.

In the instant case, plaintiffs' petition charged negligence on the part of the defendant company other than that charged against defendant Smith, and the evidence discloses that there was negligence on the part of the defendant company other than the negligence charged against Smith. Under such circumstances, a verdict releasing Smith does not release the defendant company.

The defendant company, in the first instance, upon the sale of the convertible gas burner and equipment to Fonda, made all of the representations with reference to the burner and equipment, the installation and inspection, and, in fact, it agreed to inspect the furnace when requested, and did, as shown by the record, inspect it at various times. The defendant company ordered Smith to go to the Fonda home to make estimates as to the cost of equipment. Smith testified that he received the order to go to the Fonda home from the merchandise department where he also obtained the estimates. Mr. Morgan, head of that department, went with Smith. Smith further testified that the work ticket called for the equipment to be installed and contained general directions as to the work to be done. The work ticket was his command to execute the order with reference to installation, as contained therein.

Where an employee acts under the direction of his employer, the employer is liable, not merely under the rule of respondeat superior, but rather as a joint participant in the acts complained of. *McInerney v. United Railroads*, 50 Cal. App. 538, 195 Pac. 958. See, also, *McCullough v. Langer*,

23 Cal. App. (2d) 510, 73 Pac. (2d) 649. The employees and the company are, in fact, principals and joint participants. "So a verdict against the master and an acquittal of the servant will be sufficient to sustain a judgment against the master where the act resulting in the injury complained of was committed under the express command of the master." 39 C. J. 1368.

The record in the instant case discloses that the defendant company at all times controlled and directed the installation of the gas burner and equipment here in question, and the subsequent inspection thereof was done under the defendant company's express command. The business of selling, installing and inspecting convertible gas burners and equipment is far-reaching. Each case presents a different problem in installation and inspection. Therefore, we confine and limit our judicial interpretation to the particular facts in the instant case.

Appellant further contends that the court erred in permitting plaintiffs' counsel, on cross-examination, to call attention to the doctors testifying to certain medical authorities. Upon due examination of such testimony, we find no prejudicial error in its reception or in the argument made to the jury by counsel, in which he read certain paragraphs from medical authorities which were duly in the record.

Cases generally sustain the right to cross-examine an expert witness with reference to what medical or other authorities teach on the subject under investigation, in part reliance thereon by the witness, such cross-examination being regarded as proper within reasonable limits, which is a matter largely for the court's discretion, in order to test the knowledge and accuracy of the witness. The authorities in question were not offered in evidence or any writing therefrom, and the questions were used merely to test the knowledge of the witnesses called by the defendants. See *Hutchinson v. State*, 19 Neb. 262, 27 N. W. 113; *Winters v. Rance*, 125 Neb. 577, 251 N. W. 167. The rule of law, as announced therein with reference to cross-

examination on medical authorities, governs. Other assignments of error need not be discussed.

If the plaintiffs will file within 20 days a remittitur in the sum of $369, constituting the funeral expenses, reducing the judgment to $4,631, the judgment of the district court will be affirmed, as thus modified; otherwise the judgment will stand reversed, and the cause remanded for a new trial.

AFFIRMED ON CONDITION.