**HARTFORD FIRE INS. CO. v. THOMPSON.**

No. 13881.

United States Court of Appeals Eighth Circuit.

June 21, 1949.

H. G. Wellensiek, Grand Island, Neb. (Fred T. Hanson and Frank B. Morrison, McCook, Neb., on the brief), for appellant.

W. C. Conover, Grant, Neb., and C. E. McCarl, McCook, Neb., for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

The plaintiff recovered a judgment in the trial court upon a policy of insurance issued to him by the defendant insurance company which insured him against loss to his cattle caused by lightning limited to $1,000 on his Purebred Hereford bull, $100 per head on his cows, and $50 per head on his calves. His herd consisted of the bull, 35 cows and 15 calves, running on a half section of pasture land in Perkins County, Nebraska, enclosed by a three wire fence. All of the cattle were found dead at the same time except four cows and 13 of the calves. Two cows and the calves survived. Plaintiff alleged that lightning caused the loss and the defendant denied the allegation. On the trial of the case defendant introduced

testimony tending to show that the animals died from lack of water. The jury found for the plaintiff in the amount specified in the policy for the number and kind of cattle lost (though their value was shown to be much greater), and the judgment was entered on the verdict. The insurance company appeals on the grounds (properly preserved for review) (1) that the evidence was insufficient to present a submissible case; (2) that the court erred in permitting men who were not veterinarians to give an opinion that the cause of the deaths was lightning, and (3) that the verdict was contrary to the evidence.

(1) There was evidence to show that plaintiff had long experience in raising cattle and kept the herd in question in a suitable pasture in which he had run cattle every year for five years without loss from disease, poison or sickness. It was provided with windmill, pump and tank in its northern part, and in the lower part about half a mile distant there was a lagoon. On Sunday July 28, 1946, at about 10:30 A.M. the windmill was turning and there was water in the tank. There was also water in the lagoon on that day or the day before. The cattle were in "awful nice shape." Along in the afternoon between 4 and 5 o'clock, a thunderstorm with lightning lasting five or ten minutes passed over the pasture. Lightning was seen to strike the ground three or four times and there were sheets of lightning along its course. When next seen about 48 hours later all the grown cattle in the herd except the four cows were found to be dead. Their carcasses lay in two main groups, one around the windmill and tank and the other in the mud of the lagoon from which the water had evaporated, except that one cow was lying dead on the outside of the pasture at the north end. The calves were trying to suck the dead cows. The plaintiff was notified and arrived at the pasture about four o'clock in the afternoon, an hour or so after the animals were found dead, and on view of the scene and the inspection he made he came to the conclusion that they had been killed by lightning. He had had cattle out in pasture killed by lightning every year and had carried the insurance against that hazard for several years. He had

lost one cow by lightning in this pasture about a month before. His largest number killed by lightning at one time previously had been three. He notified the local agent of the insurance company on the same day the dead cattle were found and the agent employed Dr. J. P. Guffy, a veterinarian of the town of Sutherland, to examine the carcasses and the surviving cattle. Dr. Guffy made such examination on the following morning in company with the insurance adjuster and others, and on the next day brought two state veterinarians to the scene to make their examinations. A specimen was removed from the stomach of one of the cows and preserved for laboratory examination and the carcasses were hauled off to a rendering plant at North Platte where they were processed.

There was evidence that marks were seen on some of the carcasses while they were at the pasture, described as being like a "brand," which according to the dictionary is "a mark made by burning with a hot iron," and as "brown streaks like singed hair from the shoulder down their legs and backs." The animals appeared to have died without struggle. They were not thin or emaciated and they had not paced along the fence or breached it. Nor had they been heard making any noises or commotion. Their eyes were "popping" and their horns, teeth and hooves were loose. One of the cows was observed to have a rupture of the external tissues. Men employed at the rendering plant said that black marks under the chin down the front legs were observed, about the width of an index finger and with the appearance that a hot iron had been run across the hide and burned it. They also said that the flesh of the animals when they were cut up looked like fresh butchered beef, having bright colored meat with normal amount of moisture. The hides could not be saved because they adhered too tightly to the flesh to permit separation, which was thought by some to indicate death from lightning and by others to indicate death from lack of water.

The plaintiff himself and a Mr. Loren Morris, superintendent of the rendering plant, who had long been engaged in processing dead animals and had examined over a thousand carcasses of animals that had been killed by lightning, each gave it as his opinion that the plaintiff's cattle were killed by lightning.

The appellant does not contend that the evidence showed that the loss of the cattle was caused by poisoning or disease. There was no epidemic in the area and no losses occurred at or about the time among cattle running in the numerous other pastures in that country. The laboratory tests made by the state veterinarians did not show poison in the stomach of the cow from which the specimen was taken.

The insurance adjuster who had had 18 years experience in adjusting losses of cattle alleged to be killed by lightning said that burn marks are not always visible on animals that have been killed by lightning [1] and although in two-thirds of the cases he had had they had been found near a fence, metal stock tanks or a tree that had attracted the lightning, in about one-third of the cases they were struck or lay out in the open pasture. Dr. Guffy gave it as his opinion that the cattle in question died from lack of water and that was the opinion given in answer to hypothetical questions by the witness Fred M. Maxfield, a veterinarian who testified as an expert on defendant's behalf. A skinner employed at the rendering plant, called by defendant, who had seen the carcasses also expressed the opinion that the cattle had not died from lightning but from lack of water. The adherence of the hide to the flesh indicated to him that death had come from lack of water.

None of the witnesses testified to knowledge of any instance where so many cattle in groups as widely separated had been killed by lightning at one time. One witness testified to an occasion when three head of cattle and twelve mules were killed at once by lightning and in one of the cases cited (Reeder v. Harborcreek Mutual Fire Ins. Co., 43 Pa.Super. 437), 38 sheep and

[1] Defendant's expert, Dr. Maxfield, expressed his opinion that "after a 48 hour period there is no effect of lightning on the carcass that you can discover with any degree of certainty."

four lambs were found to have been killed in that way. But defendant's witness, Mr. Frank T. Henley, a meteorologist who had made a study and observations about lightning, testified that lightning is a mysterious element about which much has yet to be learned. He defined it as "a bolt of electricity going from one cloud to another or from a cloud to the ground," and said that "it is such an unpredictable thing that he hated to testify about it." It could not be inferred from his testimony that there was anything impossible or absurd about the loss in question having been caused by lightning.

On the question whether the cattle were provided with water, the plaintiff relied on testimony adduced that the windmill and pump were working and there was water in the tank on the Sunday morning before the storm and on Tuesday when the cattle were found dead, and in the lagoon "two or three days" before they were found dead, and also upon testimony that the herd of cattle shown to be "in awful nice shape" on Sunday morning at 10:30 o'clock with water available to them, could not all be starved to death for want of water by midafternoon on Tuesday. Witnesses very experienced in the ways of cattle gave testimony concerning the violent reactions cattle indulge in on being deprived of water, such as bellowing, pacing the fences and breaking through. They also testified to the capacity of cattle to endure unharmed without water for much longer periods, and that in the course of long experience none in good condition was ever observed to die from lack of water in that country within a period of two days. Also that cattle deprived of water during such warm weather as prevailed during the last days of July would lost weight rapidly and become emaciated.

The veterinarian who testified for defendant said that if the water supplied to the cattle was diminished gradually to the point of insufficiency their reaction would not be violent and they would eventually die quietly.

■ We see no point here in attempting to discuss the minutiae and particulars of testimony upon which earnest and able counsel have seized and argued. It would require setting forth too long a record and none of the particulars is conclusive or demonstrative of the issue. That the herd was "in awful nice shape" on Sunday morning and not being seen again alive was found dead on Tuesday afternoon without evidence of epidemic or poisoning suggests of itself a very extraordinary and unusual occurrence. The defendant insures against the damaging effects upon cattle of lightning which "is a mystifying element and an unpredictable thing," and which the experienced adjuster of lightning insurance losses says may kill an animal it strikes without leaving any burn marks on its victim and which is most likely (if not certain) to enter its victim and do its fatal work unseen. It was undisputed that lightning manifested itself—sheets of it were seen—in the vicinity of the cattle at about the time they died. The case was very thoroughly tried out at North Platte where many of the jurors are called from the cattle country and spend much of their lives in the open with occasion to observe the action of forces of nature. The trial court also observed the appearance and demeanor of the witnesses and it appeared to the trial court that the issue was for the jury. Its memorandum opinion shows that the conclusion was reached upon full consideration and we do not find it erroneous.

■ The point is stressed for appellant that applicable and controlling Nebraska law requires proof by circumstantial evidence to be such as to exclude every other reasonable hypothesis and it is argued that the circumstantial evidence here relied on does not meet that requirement. But it was for the trial court to instruct the triers of the fact issue (the jury) upon the rules of law governing them in the performance of their function and in this case the appellant has not brought up the court's instructions in the record and is not in position to complain of them. If it was necessary to give the jury some special instructions on the effect of circumstantial evidence it must be assumed that it was done. We note, however, that the Supreme Court of Nebraska stated in Fonda v. Northwestern Public Service Co., 138 Neb. 262, 292 N.W. 712, loc. cit. 718: "The cause of an accident, like any other factor, may be proved by cir-

cumstantial evidence. * * * 'A plaintiff is not bound to exclude the possibility that the accident might have happened in some other way, but is only required to satisfy the jury, by a fair preponderance of the evidence, that the injury occurred in the manner claimed.'" We do not think the verdict and judgment were arrived at in disregard of Nebraska law.

(2) The appellant's contention that the court erred in permitting certain witnesses who had special training and knowledge but were not veterinarians to express an opinion as to the cause of the death of the cattle in question was fully considered by the trial court on the motion after verdict. The court said in its memorandum opinion: "Secondly, the court is charged in the demand for a new trial with error in allowing the expression of the opinions of certain men having special training, one in the diseases and causes of the deaths of animals in general, others in narrower fields of knowledge, but none of them licensed veterinarians, respecting the cause of the death of the cattle. It is not believed that the restriction to licensed practitioners of competency to express such opinions respecting human beings, extends equally to cattle. The general principle requiring special knowledge and competency is certainly applicable in either instance. But it is universally recognized that among ranchmen giving direct care to the health and diseases of cattle, and others having long and constant observation of, and contact with, cattle carcasses (e. g. hide and salvage men), many acquire a notable capacity to speak as experts, whose opinions rest upon practical training and experience rather than upon the examination of approved veterinary literature and clinical study. The opinions of such practically experienced men may be heard by the jury under adequate caution by the court touching the factors which should govern the weight to be accorded their conclusions. No criticism of that aspect of the charge is offered; and the objection, going to the foundation for, and right to express, any opinion at all, is considered to be invalid."

It is stated in 20 Am.Jur., Sec. 815, p. 685: "The fact that the care of animals is generally in the hands of practical men rather than professional men renders it necessary, when considering the admissibility of opinion testimony regarding diseases and physical conditions or care of animals, to apply a much lower standard of qualification to witnesses giving opinion testimony on such matters than is applied to expert witnesses offering testimony as to the diseases or physical condition of human beings. Persons who have habitually had the care of horses, cattle, dogs, and other domestic animals may testify as to their soundness or the disease which they have or to the cause of their death, as, for example, whether a horse died of fright or of some latent disease. A person need not be a veterinary to testify to such matters, although the testimony of the latter upon a subject of this character is clearly admissible."

32 C.J.S., Evidence § 518, p. 216, reads as follows: "A witness, of special knowledge or skill on a subject outside of the ordinary realm of human experience, may be permitted to state his inference, from facts observed by him, as to matters connected with his specialty, not only because of the frequent difficulty of communicating the facts to the jury but also because, even if the facts could be fully laid before them, they would not possess the special knowledge or training necessary to coordinate and weigh the facts so as to draw the correct and proper inference therefrom. Such a witness is frequently termed an expert, but this is inaccurate, for the skilled witness testifies as to the result of his own observation, and occupies the same position as any other witness except that within certain lines he possesses a superior knowledge which enables him to understand, as one without such special knowledge could not, what he has observed, although he may also be competent to testify as an expert on hypothetically stated facts."

The Nebraska cases appear to be in accord with the text. Cf. Sioux City & Pac. Ry. Co. v. Finlayson, 16 Neb. 578, 20 N.W. 860, 49 Am.Rep. 724; McElwain v. Union Pacific Ry. Co., 101 Neb. 484, 163 N.W. 845, 1 A.L.R. 533; Allender v. Chicago & Northwestern Ry. Co., 119 Neb. 559, 230 N.W. 102.

We think the declarations of the trial court and its admission of the opinions in evidence were not erroneous.

(3) The appellant's contention that the verdict was contrary to the evidence merely compels the observation that fair minded impartial men could reasonably and honestly have arrived at a different conclusion on the evidence in this case. But this court is not the trier of the fact issues and limits its function to the review of errors. The verdict and judgment are supported by substantial evidence. We find no error in the trial and the judgment is affirmed.

Affirmed.