MAX BIXBY ET AL., ADMINISTRATORS, APPELLANTS, V. MAYMIE F. AYERS ET AL., APPELLEES.

298 N. W. 533

FILED JUNE 6, 1941. No. 30861

*Davis & Stubbs,* for appellants.

*Chambers, Holland & Locke* and *T. J. Kiesselbach, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

EBERLY, J.

This is an action at law under our Lord Campbell's Act, in which Maymie F. Ayers and Loyd Ayers, wife and husband, are named as defendants, to recover damages for the suffering and death of Albert Hansen who died from injuries received in an accident which occurred on June 22, 1939, on state highway No. 3 south, at a point about one-half mile east of the village of Hardy, Nebraska. The automobile involved was owned by defendant Maymie F. Ayres, and at the time of the accident was being driven as a family car by defendant Loyd Ayers, he being hereinafter referred to as the defendant.

The petition alleges, in substance, that the defendant at the time and place stated, while traveling westward, carelessly and negligently drove his automobile "into, against, upon and over the said Albert Hansen and the bicycle" upon which the deceased was then riding westward along the north and right side of such highway, thereby inflicting injuries which caused his death. This pleading charged negligence of defendant in the following particulars, viz.:

(1) Defendant's automobile was driven at a dangerous and

reckless rate of speed without regard to the condition of the highway or the safety of others upon the same; (2) failure of defendant to keep proper lookout; (3) failure of defendant to turn to the left and south side of the highway in order to pass said Albert Hansen; (4) failure of defendant to apply his brakes so as to stop his said car or reduce its speed so that he could control the same in approaching and passing the deceased. To this pleading defendants, by answer, denied generally the allegations thereof, and joined issue by specially pleading the facts as subsequently testified to by the defendant, including the allegation that the plaintiffs' decedent from a position on the left side of the highway, taken by him after knowledge of defendant's approach and due warning thereof, as defendant's automobile was overtaking and passing him, suddenly turned his bicycle to the right and negligently suddenly drove the same in front of defendant's automobile without giving any warning of his intention so to do, and so close to defendant's automobile as to afford defendant no opportunity to avoid the accident by stopping his car. Further, that this act of plaintiffs' decedent constituted gross negligence, was the sole and proximate cause of the accident which ensued, and that defendants were without blame. Plaintiffs joined issue by a reply, in substance a general denial. The cause was tried to a jury duly impaneled and sworn, and at the close of all the evidence the trial court sustained a motion on behalf of the defendants for an instructed verdict in their favor. From the order of the trial court overruling their motion for a new trial, plaintiffs appeal.

The following constitutes a résumé of the evidence introduced by plaintiffs.

Addis Jensen, a witness called by them, testifies that on June 22, 1939, "about 3 o'clock or a little after," he was assisting in the operation of a binder, harvesting wheat one-half mile north of the highway on which the accident in suit occurred. As the binder was going south he saw an automobile on this highway, traveling westward, sweep over a hill on the highway to the eastward, then down over a

bridge and then up very nearly a half mile of gradual incline, at an estimated speed of 60 to 70 miles an hour. It came to a sudden stop about half way up the hill. The day was bright and clear and the sun was shining. The gravel on this highway was dry. This witness never noted the presence on this highway of Albert Hansen, the deceased, or his bicycle; does not testify to the passing or stopping of other cars at the scene of the accident, and in fact is wholly unconscious of the fact that an accident has occurred. Between 7 and 8 o'clock in the evening of the day of the accident, having been advised of the happening of the same, this witness "went down where he had seen that car;" there he saw tracks made by the sliding wheels of an automobile situated on the north side of the road about 90 to 100 feet in length. The right track was about four feet from the ridge of gravel on the north side of the road at its east end and about three feet therefrom at the west end. This witness mentions no other tracks or marks save the two tracks made by the sliding wheels of the automobile.

Leslie Jensby, a witness of plaintiffs, testifies that he was on the afternoon of June 22, 1939, "running the tractor with a go-dig behind it." He was then about 120 rods north from state highway No. 3. A little after 3 o'clock he saw the Ayers car come over the hill south of his field at a rate of speed estimated by the witness to be "about 60 or 65 miles an hour." It went down the hill and over the bridge and on, and there was no slow up of the speed until the car was suddenly stopped. This witness wholly failed to note the presence of the deceased and his bicycle on this day at or near the time of the accident, and we are likewise wholly in darkness as to the means by which he identified the car he refers to as the "Ayers car."

Elmer Perry, plaintiffs' witness, testified that he had occasion to pass the scene of the accident, going east, a little after 3 o'clock p. m. on June 22, 1939. He noticed the skid marks and what afterwards he discovered to be a bicycle lay north of the road. He continued in the truck on to the bridge where he turned around and came back to

where another car had stopped and there he saw the other man and the bicycle and certain tracks. He says the bicycle "was lying kind of in the edge of the weeds there; they had taken it and put it out there (on the north side of the road) I imagine. * * * The only tracks you could see was where the tires had been sliding, and they had slid, Oh, possibly 80 to 100 feet, that is, as to my judgment. * * * The tracks was just about as straight as you could get 'em; they was a little bit maybe angled, but they wasn't wavy." The north track of the skidding car was about three or four feet from the north side of the highway. "Q. Did you see any other marks on the road besides these tire marks, skid marks? A. Where—I could see where it looked like the bicycle had been struck. (This answer was stricken by the court as not responsive.) Q. Tell what you saw there, Elmer. What marks were there in the road? A. Well, there was a kind of—right from the north track there was for a small distance there was a brushed place in the gravel where it looked like something had just raked the gravel just a little. Q. Did that run up the road? A. Yes; it did. Q. How far? A. Oh, I would say 15 to 20 feet. Q. Where, with reference to the length of these tracks was this track, where was it with reference to the—A. (Interrupting) Well, on the north track, the mark that I noticed was possibly, Oh, that far, six, eight, ten inches from the inside of the track there. * * * Q. Where, from the place where this inside mark in between the other two tire marks started, where did the bicycle lie, to the west or east? A. To the west. Q. And about how far? A. Well, to where the mark ended, why it—from the start to the end of the mark, why it was about 15 to 20 feet, and then from the start of the mark on to where the bicycle was I would imagine it was a little further than that. The bicycle had already been picked up and moved over."

Guy E. Scott, the undertaker at Hardy who prepared the body of Albert Hansen for burial, as plaintiffs' witness, testified as follows: "Q. Will you just tell the jury, in connection with your work in the preparation of his body,

what if any marks or breaks or other evidences of physical injury were apparent on the body? A. Well, on the back across the shoulders he was what you would call burned with the passing over the—possibly the gravel, or coming in contact with some object, and ·the right shoulder was broken, as well as—seemingly the left was out of place and was through the chest where he had been crushed by it."

Dr. C. G. McMahon, the physician who attended the deceased after the accident and until his death, testified as plaintiffs' witness that Albert Hansen was conscious when he received him. And further, "Q. Where did you take him? A. Took him first to the X-ray room and made an X-ray picture of his chest, and then took him upstairs immediately and put him to bed, made him as comfortable as we could. Q. Will you describe his injuries as far as you observed them, Doctor? A. He had a severe contusion of the chest, was the principal injury, the worst on the left side, with a fracture of the left collar bone, and the X-ray of his chest showed two broken ribs on the left side."

Three pictures of highway No. 3 south, at and near the place of the accident, taken the day previous to the trial in the district court in October, 1939 (four months after the occurrence of the accident), and the bicycle ridden by the deceased at the time of the accident were also placed in evidence by plaintiffs.

The width of the driving surface of this road is 28 feet, 6 inches.·

From the evidence as an entirety, it may be said that the deceased, at the time of the fatal accident, was 14 years of age, and, had he lived, he would have become 15 years of age during the month of October following. He was a strong, tall, well-built boy. He was in the eighth grade of· the public school he attended, and played school football. He was very industrious and capable of performing farm work of all kinds. One of the plaintiffs' witnesses stated: "His father wasn't so well, and I seen the boy always was first to grab hold when he had to crank the old car." The first of this year (1939) the boy was really able

to do a man's work on the farm and actually performed all kinds of farm work. Witness Jensen, who testified for plaintiffs, valued the boy's services as an employee on his father's farm at from $700 to $1,000 per annum.

The defendants, as their case, introduced, in addition to the testimony of defendant Loyd Ayers, the evidence of Edwin Achterberg. Achterberg lives in Deshler, Nebraska, and is employed by the Rosmiller Oil Company. On the afternoon of June 22, 1939, he was driving home to Deshler. A little after 3 o'clock p. m. he came to the scene of the accident. A car was stopped in the road; the defendant was standing toward the back of his car waving the witness to stop. He says: "At the time I stopped, why I just glanced to the back of the car and seen a boy with him there. Of course, I got out of the car right away and looked at the boy to see whether he was alive or whether he was dead, and Mr. Ayers says to me, 'Help me put him in the car so we can take him to a doctor,' and so that's what I did; and as we had him lying in the back seat of the car I asked the boy what his name was and he says his name was Albert Hansen. * * * I went and notified his parents then." As to skid marks witness testified in part, in reply to a question as to how long those skid marks were and where they extended on the highway, "A. Well, I can't say for certain. I didn't take measures or anything like that, and the way it was we were both so excited I just took a rough glance at the skid marks, and it looked to me like it was approximately between eight and ten foot, that's my judgment it was at that time, see; now whether it's right or not, I couldn't say." Further, "Q. Well, you believe you know approximately how long eight to ten feet is? A. Yes; that's what my glance was at that time. Q. Were they deep skid marks in the gravel? A. Well, they looked rather broad, the gravel was practically all rubbed off, the space you could see it had been brushed was very hard. Q. Did those skid marks lead up to the back wheels of the car as it sat there? A. Yes, they did. Q. Where was the car setting with reference to the north or south side of the highway?

A. It was setting on the north side of the gravel. Q. Do you know how far out from the gravel ridge? A. I should judge, Oh, aproximately two or three feet, something like that. Q. Were they setting straight east and west? A. They was facing straight east and west, yes. Q. You might tell the jury this, as I understand it this hill went up toward the east, did it? A. Towards the west. Q. On toward the west? A. Yes. Q. Is it a fairly long hill? A. Yes; it is. Q. Can you tell the jury about how long it is and what type hill it is? A. Well, this hill—there's a bridge at the bottom of the draw and from the bridge on it slopes up toward the west, and after you get up the hill a ways, why it takes another turn and goes up a little higher, it's a little steeper hill; in other words there's a low, seems to be a kind of low place in the middle of the hill. Q. Kind of a double hill? A. Yes; it's a double hill, what you might call it. Q. Where on this hill was this car standing when you got there? A. It was standing upon the second—on the second raise, about, Oh, I don't know, I should judge probably one-fourth the way between the start of the hill and the top of the hill. * * * Q. You say these skid marks were pretty evident for a distance behind the car on up to where the back wheels stopped, is that right? A. Umhum (yes). Q. And the road at that point as a matter of fact was pretty hard, wasn't it? A. Well—Q. (Interrupting) There is a well-packed gravel highway? A. Yes. Q. There hadn't been any rain or anything? A. No. Q. So as you saw it the first time, those skid marks just cleaned the gravel clean? A. Yes; it is a wide, plain wide mark. Q. That went clear up to the back wheels, is that right? A. Yes. Q. Where was the body of this boy, was it lying across this skid mark? A. Well, that I don't recall either, it must have, though, because he was lying right in back of the—his hips was just about even with the back of the wheel. Q. Under the back wheel? A. Not under, in back of the back wheel. Q. Right back of the back wheel? A. Umhum (Yes). Q. Did the marks show that this back wheel had gone over the boy? A. No; it didn't, I couldn't say that it did."

The bicycle of the deceased, involved in this collision, is in evidence. The evidential foundation was limited to its condition after the accident. Its condition previous thereto is not shown. It clearly appears that it is not a new machine, and has been in use for a considerable period of time. Its model is that of a lady's bicycle. Looking at this machine from rear to front, it appears that the front wheel, steering post, handle-bars, and a 10 by 15 inch wire carrier basket attached in front are apparently not seriously damaged. Small particles of paint, however, appear to have been abraded therefrom, as well as from other parts of the machine, and the wire carrier basket is slightly bent up in places. The two rods leading from the front wheel-post to the sprocket wheel are slightly out of line. The rod leading from the sprocket wheel to, and supporting, the seat is bent downward and backward, and slightly to the left at a point equally distant from the sprocket wheel and the seat. The two rods which connect the axle of the rear wheel to and with the seat rod are both badly bent to the right. The bend in the right rod appears to be about six inches below the seat and the bend in the corresponding left rod occurs some nine inches below the seat. The bend in the left rod is so abrupt as to force that rod through the spokes of the rear wheel. The arm of the seat post is turned to the right. The sprocket wheel and right pedal are in normal condition; the right pedal bar is badly bent. The left pedal bar appears slightly bent to the right; but the entire rear wheel frame appears to be bent to the left slightly. The u-shaped frame from the rear wheel axle to the bottom center of the frame is bent to the left, the condition of this part and of the left pedal being such as to prevent the left pedal bar from clearing the frame. The "u" frame from the rear axle to the seat, as already described, is bent down and to the right, and the left arm of the "u" is bent sharply to touch the right arm of this "u." This necessarily shortens the distance between the seat and rear axle, and pulls the seat and its supporting rod backward and downward. The rear wheel rim is broken into

four parts. Apparently one-half of the rim is locked in position by the bent "u" frame leading from the rear axle to the rear post. The remaining three parts hang from the spokes.

The only eyewitness who saw what occurred at the time of the accident was the defendant Loyd Ayers. He states that he first saw the boy when he came over the top of a hill some distance east of where the accident occurred. The defendant was then traveling 50 to 60 miles an hour. The boy was then proceeding on the right or north side of the highway. As defendant approached the boy he reduced to a speed of 20 to 25 miles an hour and sounded his horn. The boy turned around, looked back at the defendant and then rode his bicycle to his left over part of the center of the highway. Thereafter when the defendant came close, traveling on the right side of the highway and was about to pass the boy, he again sounded his horn. At this alarm the bicycle rider suddenly and without warning, when defendant's car was about 15 feet to his right rear, turned his wheel sharply to the right and "scooted" across the road directly in front of defendant's oncoming automobile. The defendant immediately applied his brakes, so hard that the engine of the automobile was killed, but he was unable to avoid the accident. There was an impact; the automobile was stopped within a car length. After the accident the boy lay about three feet "in back" of the automobile right rear wheel with his hips about even with it. So far as advised by the record, the boy had received no head injuries, and was conscious. There is no evidence of any injuries to his lower extremeties. The bicycle lay a few feet west of the boy and opposite the right rear door of the car. The defendant got out of his car immediately, and, aided by a passing motorist, placed the injured boy in his automobile and moved him to the hospital.

The controlling question here presented is one of fact. The evidence relating thereto by which the rights of the parties will be determined must be considered in the light of the following principles, viz.: The issues as made up by

the pleadings impose on the plaintiffs the burden of proof, and to recover they must establish by a preponderance of the evidence that the defendant was guilty of actionable negligence which was the proximate cause of·the injuries received by the deceased.

"Proximate cause, as used in the law of negligence, is that cause which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the accident could not have happened." *Anderson v. Byrd,* 133 Neb. 483, 275 N. W. 825.

Negligence is never presumed, and cannot be inferred from the mere fact that an accident happened. *Anderson v. Interstate Transit Lines,* 129 Neb. 612, 262 N. W. 445; *Bergendahl v. Rabeler,* 133 Neb. 699, 276 N. W. 673; *Engel v. Chicago, B. & Q. R. Co.,* 111 Neb. 21, 195 N. W. 523; *Thompson v. Young Men's Christian Ass'n,* 122 Neb. 843, 241 N. W. 565; *Meyers v. Neeld,* 137 Neb. 428, 289 N. W. 797.

In the instant case the evidence upon which the plaintiffs rely to establish the cause of action and overcome the direct evidence of the defendants is almost wholly circumstantial. This court is committed to the view, viz.:

" 'Circumstantial evidence cannot be said to be sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such a nature and so related to each other that the conclusion reached is the only one that can fairly and reasonably be drawn therefrom. *Asbach v. Chicago, B. & Q. R. Co.,* 74 Ia. 248; *Lopez v. Campbell,* 163 N. Y. 340; *American Freehold Land Mortgage Co. v. Whaley,* 63 Fed. 743.' *Blid v. Chicago & N. W. R. Co.,* 89 Neb. 689." *Anderson v. Interstate Transit Lines,* 129 Neb. 612, 262 N. W. 445.

Assuming that a bicycle is a "vehicle," as that term is used in our statutes, and as such upon public highways equal in right to that enjoyed by motor vehicles, it would seem that they are equally subject to the law of the road.

Bicyclists while traveling on the highway are controlled by the rules of the road as recognized at common law. They have the same right as automobile drivers to use the streets

and roads, and are chargeable only with such ordinary care for their own safety as prudent persons of like age and experience would exercise. 4 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) sec. 2736.

The rule of the road in Nebraska is: "Except when overtaking and passing on the right is permitted; the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal," etc. Comp. St. Supp. 1939, sec. 39-11,102; Laws 1935, ch. 134, sec. 5.

The undisputed evidence in the instant case is that the deceased heard the audible signal given by the defendant as the latter was approaching from the rear, looked back and deliberately turned his bicycle to the left, and occupied the track the law intended to reserve for the passing vehicle.

The governing statute is apparently declaratory of the common law in the United States, and in harmony with the general custom that here obtains.

In passing on similar situations, very respectable courts have seen fit to declare that in taking the wrong side of the road the driver of the overtaken car assumes the risk of his experiment, and it is for him to use greater care than would have been required of him if he had kept on his right side. When a collision occurs in such circumstances, the presumption is against him, and especially so when the collision occurs in the dark. *Angell v. Lewis,* 20 R. I. 391, 39 Atl. 521, 78 Am. St. Rep. 881. And persons who pass him have a right to presume that he will comply with the law of the road, and that no greater caution or skill will be required on their part than would be necessary if he was on his own (right) side of the road. *Borden's Condensed Milk Co. v. Mosby,* 250 Fed. 839, 163 C. C. A. 153.

"If, however, the driver of the forward car sees fit to give way so as to allow the rear car the use of the entire track, the driver of the latter vehicle may properly take it." 2 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) sec. 939. See, also, *Zellmer v. McTaigue,* 170 Ia. 534, 153 N. W. 77.

The attempt of the rear vehicle to pass to the right side

of the road does not relieve the driver in front of the duty of exercising the degree of care and caution an ordinarily skilful driver would use under like circumstances. Passing a bicycle on the right side is not necessarily negligence in a given case. It is not negligence if not the proximate cause of the accident or injury to the injured party. *Johnson v. Kinnan*, 195 Ia. 720, 192 N. W. 863; *Herdman v. Zwart*, 167 Ia. 500, 149 N. W. 631.

"Conceding a driver's right to use any portion of the highway open to him, and which circumstances, or his desires, may prompt him to use, his rights are necessarily subject to equal rights on the part of other users of the highway, and, in passing from one side to the other, he is bound to do so with proper regard to the rights and safety of others overtaking him on the highway." 2 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) sec. 934. See, also, *Piper v. Adams Express Co.*, 270 Pa. St. 54, 113 Atl. 562.

"Thus, if the driver of the forward vehicle has turned to the left, giving clear indication that he intends the rear vehicle to pass to his right, and then, when the driver of the latter vehicle has started to do so and has reached a position where it cannot stop or change its course without a collision, the driver of the forward vehicle suddenly turns in front of the rear vehicle by going to the right, the driver of the latter vehicle cannot be said to be responsible for an ensuing collision." 2 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) sec. 941. See, also, *Manceaux v. Hunter Canal Co.*, 148 La. 93, 86 So. 665.

It would appear that undisputed evidence clearly establishes that the defendant is not chargeable with actionable negligence. But, in addition to this, the principle of law has been repeatedly announced by this tribunal that, where the evidence establishes that the plaintiff's decedent was guilty of more than slight negligence, the question becomes one of law for the court, and it is the duty of the court to direct a verdict. *Eaton v. Merritt*, 135 Neb. 363, 281 N. W. 620; *Bergendahl v. Rabeler*, 133 Neb. 699, 276 N. W. 673;

*Ritter v. Hering,* 135 Neb. 1, 280 N. W. 231; *Kudrna v. Sarpy County,* 125 Neb. 83, 249 N. W. 87; *Johnson v. City of Omaha,* 108 Neb. 481, 188 N. W. 122; *Nelson v. Plautz,* 130 Neb. 641, 265 N. W. 885; *Anderson v. Altschuler,* 125 Neb. 853, 252 N. W. 310.

In the instant case, the deceased had turned his bicycle to his left and was traveling west in a zone of perfect safety. No danger whatever then threatened him. Under these circumstances this court is committed to the rule, viz.:

"When one, being in a place of safety, sees and is aware of the approach of a moving vehicle in close proximity to him, suddenly moves from the place of safety into the path of such vehicle and is struck, his own conduct constitutes contributory negligence more than slight in degree, as a matter of law, and precludes recovery." *Travinsky v. Omaha & C. B. Street R. Co.,* 137 Neb. 168, 288 N. W. 512. See, also, *Troup v. Porter,* 126 Neb. 93, 252 N. W. 611; *McDonald v. Omaha & C. B. Street R. Co.,* 128 Neb. 17, 257 N. W. 489.

Nor do the facts and circumstances disclosed by the record, including the physical condition of the deceased, the marks upon the highway at the scene of the accident, and the positions and conditions of the automobile and the bicycle, militate against this conclusion. In determining a somewhat similar question, in *Kroell v. Lutz,* 210 S. W. (Mo. App.) 926, the court of appeals stated its conclusion in the following language, viz.:

"Where there was a collision of automobiles at a street intersection, it cannot be said as a matter of law that the accident did not happen as stated by either party, solely from the respective positions of the automobiles after the accident; there being such a complexity of forces and resultants as to afford no idea where the two automobiles would go or what they would do."

In *Corcoran v. Ward,* 115 Cal. App. 180, 1 Pac. (2d) 455, we find the following announced as the view of that court, viz.:

"The complexity of forces operating on two rapidly mov-

ing vehicles in collision with one another often makes it exceedingly difficult to reconstruct the manner of the happening of the accident from testimony concerning the marks found upon the highway and the positions and condition of the cars after the accident."

As has been heretofore observed, "Negligence cannot be inferred from the mere fact that an accident happened. See *Omaha & R. V. R. Co. v. Clarke,* 39 Neb. 65; *Vansyoc v. Freewater Cemetery Ass'n,* 63 Neb. 143." *Anderson v. Interstate Transit Lines,* 129 Neb. 612, 262 N. W. 445.

We have seen that the accident occurred on state highway No. 3 south, one of the principal highways in the southern part of the state. Three pictures of this highway (which we have hereinbefore referred to) taken four months after the occurrence of the accident appear in the record, but the record is silent as to the appearance of this highway and the marks thereon immediately prior to the accident. After the accident the defendant's automobile carried but one new mark, and that upon the right front fender, but it in no manner contradicts defendant's evidence as to the movements of the deceased immediately preceding the moment of impact. The evidence as to the marks upon, and injuries to, the bicycle have already been detailed. But they are shown only as they appeared after this mishap was complete and all movement had ceased. It would seem quite certain that the first impact occurred when the deceased was still mounted on his machine and still seated in the saddle. As the lower extremities of the deceased carried no bruises, so far as we are advised by the proof, we may doubtless infer from the condition of the rear wheel of the bicycle that the first impact occurred there, and that the injuries received by the deceased were inflicted subsequent thereto. But in the accident the boy was separated from his bicycle. At least he passed to the rear of the automobile in some manner, and was found some three feet in the rear of the right rear wheel. His bicycle was then laying about even with the right rear door, some six feet west of him. There is no evidence as to the position of the boy after the first im-

pact between his bicycle and the automobile. There is absolutely a void in the evidence as to whether the injuries from which he suffered were inflicted by the bumper of the car, by the axles, by other parts of the automobile, or by its wheels passing over him. Much the same is true of the bicycle. The testimony as to the bicycle and its condition has already been detailed. But this is only shown as it was after the accident was completed and all movement ended. The bicycle, accepting the testimony of plaintiffs' witness Elmer Perry, had been, by the force of the collision, forced west along the face of the highway some 15 or 18 feet. The attachment of, or connection between, the bicycle and the automobile during this journey is not in any manner shown. Whether it was again struck by the bumper after the first impact, whether a lesser clearance brought it in contact with the axles or other parts of the car, or whether the front wheel passed over a part of it, and what its position on the ground may have been while damages thereto were being inflicted, the record and the machine furnish no basis for a conclusion.

As the theory of both plaintiffs and defendants is that deceased was "run down" while riding his bicycle at the instant of the first impact, his lower extremities naturally would be first exposed to injury, and the injuries to the upper chest could occur only after the first impact and would be occasioned by colliding with bumper, axles, or other parts of the automobile, or by the passing of its wheels over the prostrate body. The appearance of the back of deceased indicated that he was dragged across the graveled road-bed for some distance. But nothing in the evidence affords us any light upon the position of the body with reference to the automobile during the interval of time that ensued after the first impact, and as to when, where, and how the fatal injuries were thereafter inflicted. In short, we have here presented a case where evidence of controlling circumstances in no manner conflicts with the evidence of the defendant, who appears as a witness, and who is wholly unimpeached.

The applicable rule invoked by this record, this court has heretofore stated as follows, viz.:

"The competent relevant testimony of unimpeached witnesses should not be held to be contradicted by inferences from circumstantial evidence, unless these circumstances and the natural inferences to be deduced therefrom cannot in reason be reconciled with the conclusion that the direct evidence is true." *Blid v. Chicago & N. W. R. Co.*, 89 Neb. 689, 131 N. W. 1027.

It follows, therefore, that the action of the trial court in instructing a verdict for the defendants is sustained by the record, and the judgment is

AFFIRMED.

SIMMONS, C. J., dissenting.

This is an action to recover damages for the suffering and death of 14-year-old Albert Hansen which resulted from a collision between an automobile and a bicycle. Plaintiff contends that the accident was caused by the negligence of the defendant Loyd Ayers. Defendants contend that the accident was caused solely by the negligence of plaintiffs' decedent.

After both parties had rested, defendants moved that a verdict be directed in their favor against the plaintiffs, for the reason that the evidence was insufficient to sustain a cause of action against them and in favor of the plaintiffs, and that the evidence, as a matter of law, showed plaintiffs' decedent to have been guilty of more than slight negligence which was the proximate cause of the accident.

The trial court sustained the motion. Plaintiffs appeal.

There is no dispute as to the following facts. The afternoon of June 22, 1939, was clear, and the road was dry. About 3 p. m. the deceased was riding a bicycle and the defendant Loyd Ayers (hereinafter called the defendant) was driving a Chrysler Royal automobile westward along a state two-lane highway, which at the point of the collision was 28 feet 6 inches wide on the traveled portion. A ridge of loose gravel was along the top of the north side of, and parallel with, the highway. Approaching the point of

collision from the east, the highway comes for some distance down a hill, crosses a bridge in the valley, and goes up another incline. The accident occurred near the top of the hill to the west of the bridge. The collision occurred while the deceased and the defendant were both on the north side of the road. Defendant saw the deceased about 200 yards ahead. He continued to overtake the deceased without turning to the left or to the center of the road. His car collided with deceased's bicycle, which threw the deceased therefrom and caused injuries which resulted in death some eight hours later. The skin of deceased's shoulder was burned as though it was caused by sliding on the gravel. He suffered a contusion of the chest, which was worse on the left side, a fracture of the left collar bone, and two broken ribs on the left side. After the collision, the defendant's car was stopped headed west about three feet north of the ridge of gravel. The deceased's bicycle was on or beyond the ridge of gravel and about opposite the right rear door of defendant's car. The deceased was lying, head to the east, north of defendant's car, and his feet were about three feet east of the rear end. The only mark on defendant's car was a dent on the right front fender.

There is a dispute as to the speed of defendant's car. Two witnesses for plaintiffs, who were working in separate fields a third and a half mile away, testify to having seen a car about 3 p. m., traveling at a rate of from 60 to 70 miles an hour, come over the hill from the east, going west, and that it came down the incline across the bridge and up the hill without slackening speed and stopped abruptly near the crest of the hill to the west of the bridge. Neither of the witnesses saw the deceased, or the collision, or knew at the time the cause of the sudden stop. Later that evening after hearing of the accident, one of the witnesses went to the point of the sudden stop and identified skid marks found on the highway at the point of the collision. Defendant testified that his speed was not over 60 miles an hour as he came over the hill to the east. His testimony as to his speed thereafter will be related later herein.

Two witnesses for plaintiffs testified that there were skid marks at the point of the accident 80 to 100 feet long. One witness was referred to above. The other saw the marks shortly after the accident, after defendant's car had left, but before the bicycle had been removed. This witness says these skid marks were the "only tracks you could see." This witness also testified to marks (a brushed place) about 15 to 20 feet long just inside the right or north skid marks of the car. A witness for defendant testified that he "glanced" at the skid marks, and that they were 9 to 10 feet long behind defendant's car where the gravel was brushed very hard and practically rubbed off. However, after he assisted in putting the deceased in defendant's car he left immediately, made no further examination of the tracks, and admitted that they might have been longer. Defendant did not investigate the skid marks. All witnesses put the skid marks at the same point, running east and west, two to three feet from the ridge of gravel and turning slightly toward the south at the west end.

The bicycle in the condition in which it was found after the accident is in evidence. Its frame construction is that of a lady's bicycle. The front wheel, steering post, and handle bars are in normal condition. The frame leading from the sprocket wheel axle to the front post is bent in and directly down. The frame leading from the sprocket wheel axle to the seat post is bent directly forward. The arm of the seat post is turned to the right. The sprocket wheel, pedals, and pedal bars are in normal position. The entire rear wheel frame is bent to the left. The U-shaped frame leading from the sprocket wheel axle to the rear axle is bent to the left so that it prevents the left pedal bar from clearing the frame. The U-frame from the rear wheel axle to the seat is bent up and to the right, and the left arm of the U bent sufficiently to touch the right arm of the U. The rear wheel rim is broken into four parts. Approximately one-half of the rim is locked in position by the bent U frame leading from the rear axle to the seat post. The remaining three parts hang from the spokes, the larger segment being

the part nearest the bottom. The other two smaller parts are those immediately to the rear.

Defendant was the only eyewitness. He testified that, as he was approaching the bridge, he slowed down; that when the deceased was about at the middle of the hill and he was about 20 to 25 yards behind him, he "honked" his horn; that, at that time, his speed was about 20 miles an hour; that deceased turned around, looked, rode across the road to the south "probably 15 to 20 feet," and then started west, sitting on the seat and pedaling; that when he was 15 to 20 feet (later changed to 10 to 15) from the deceased, he honked his horn again, picked up speed to go past the deceased and was going faster than deceased when the deceased "scooted in front" of him "awful near" at a right angle to his car and into the path of his car; that he put on his brakes hard, pulled a little bit to the center of the road to miss him, the impact followed, and he stopped in a car's length; that, at the time the deceased crossed into his path, he (defendant) was going 15 to 20 miles an hour. Defendant was not sure, but he figured his fender hit the pedal of the bicycle. The deceased's body was in front of a point between the center of the hood and the right fender at the time of the impact.

Plaintiffs' contention is that the defendant ran down the deceased from the rear and that negligence has been established. Defendant's contention is that the deceased was in a place of safety, moved therefrom into a place of danger, and that his act in so doing was the sole and proximate cause of the accident, citing *Travinsky v. Omaha & C. B. Street R. Co.*, 137 Neb. 168, 288 N. W. 512.

The question then is directly presented. How did the accident happen?

"A motion for a directed verdict must, for the purpose of a decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and said party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every in-

ference that can reasonably be deduced from the facts in evidence." *Moncrief v. Interstate Transit Lines,* 129 Neb. 168, 261 N. W. 163.

Where the motion for a directed verdict is made at the close of all evidence and after all parties have rested, the evidence to be considered under the above rule includes that offered both by the plaintiff and the defendant and is not limited to the evidence offered by the party against whom the motion is directed. 64 C. J. 443.

"The cause of an accident, like any other factor, may be proved by circumstantial evidence. * * * In the case of *Tonkovitch v. Indiana Mining Co.,* 153 N. W. 811 (187 Mich. 186), it was held: 'A plaintiff is not bound to exclude the possibility that the accident might have happened in some other way, but is only required to satisfy the jury, by a fair preponderance of the evidence, that the injury occurred in the manner claimed.' And in *Markussen v. Mengedoht,* 132 Neb. 472, 272 N. W. 241, it was held: 'Where facts and circumstances are established from which the manner of sustaining injuries can be logically inferred, an issue is presented for the jury.'" *Fonda v. Northwestern Public Service Co.,* 138 Neb. 262, 292 N. W. 712.

What then are the facts which must be resolved in favor of the plaintiffs and what are the inferences that can reasonably be deducted from the facts in evidence from which a jury might logically infer and determine that the injury occurred in the manner claimed?

They are that the deceased was traveling west on the north side of the highway, where he had a lawful right to be. The defendant approached deceased from the rear, driving his car at a speed in excess of .60 miles an hour, saw deceased at a distance of at least 600 feet ahead, proceeded to overtake him without slackening his speed until too late to avoid hitting him; that his speed was greater than was reasonable and proper having regard for the traffic, use, and condition of the road, and obviously at a rate of speed such as to endanger the life and limb of persons lawfully on the highway (Comp. St. Supp. 1939, sec.

39-1193) ; did not at any time turn to the left to a safe distance to pass the deceased, as he was required by law to do (Comp. St. Supp. 1939, sec. 39-11,102) ; that he struck deceased's bicycle in the rear while deceased was on the extreme north side of the highway, knocked deceased to the ground, causing his injuries and death. (The violation of section 39-1193, *supra,* is evidence of negligence. *Troup v. Porter,* 126 Neb. 93, 252 N. W. 611.)

If the jury determined the facts to be as above outlined, they could also have determined that the defendant failed to do what a reasonable and prudent person "would ordinarily have done under the circumstances and situation," or that he did what a reasonable and prudent person "under the existing circumstances would not have done," and that his acts were therefore negligent (*Eaton v. Merritt,* 135 Neb. 363, 281 N. W. 620), and evidenced a reckless disregard for the safety of the deceased.

Where, from the evidence before the jury, different minds might reasonably draw different conclusions as to defendant's liability, it is error to direct a verdict for defendant. *Sgroi v. Yellow Cab & Baggage Co.,* 124 Neb. 525, 247 N. W. 355; *Plotkin v. Checker Cab Co.,* 133 Neb. 1, 274 N. W. 198.

Defendant cites and the majority relies upon the first paragraph of the syllabus from *Blid v. Chicago & N. W. R. Co.,* 89 Neb. 689, 131 N. W. 1027, which is:

"The competent, relevant testimony of unimpeached witnesses should not be held to be contradicted by inferences from circumstantial evidence, unless those circumstances and the natural inferences to be deduced therefrom cannot in reason be reconciled with the conclusion that the direct evidence is true."

Defendant argues that, if the testimony of the defendant and his witness "is worthy of any belief, it constitutes the only explanation for the accident and in the absence of evidence to the contrary there was nothing to go to the jury." The majority accept this theory. The credibility of a witness, including the defendant, is a matter for the jury to determine. Was there "evidence to the contrary?" Was

the defendant's testimony impeached? Was it contradicted by direct testimony? Was it contradicted by "circumstances and the natural inferences to be deducted therefrom which cannot in reason be reconciled with the conclusion that the direct evidence is true?" The answer to all these questions must be in the affirmative.

The defendant's testimony as to the speed of his car is definitely contradicted both by the eyewitnesses and by the skid marks. Common knowledge of automobiles is enough to tell us that an automobile going at 20 miles an hour, which has brakes applied sufficiently hard to kill the engine, would not skid for 80 to 100 feet. His testimony that he stopped in a car's length is contradicted by the mark on the gravel, inside the right skid mark that was 15 to 20 feet in length, and likewise by the position of deceased's body and bicycle after the accident. His testimony that the bicycle was lengthwise to and at almost right angles with the front of his car at the time of the impact is contradicted by the condition of the bicycle. His testimony that the deceased was upright on the bicycle and his body in front of a point between the center of the hood and right fender at the time of the impact is contradicted both by defendant's car and the bicycle. Had the bicycle and the deceased been in the position in which the defendant puts them by his testimony, the front wheel, steering post, and handle bars of the bicycle would have been in front of the right fender of defendant's car. The only mark on. the car was a dent in the right fender. A blow of some force was necessary to make the dent. The front wheel, steering post, and handle bars of the bicycle show no evidence of an impact. The severe injuries to deceased's body were on the left side.

The jury could have properly found that the impact came directly from the rear. Most certainly there are no marks on the bicycle that indicate the truth of defendant's contention that the impact came when the bicycle was at almost right angles to the car and its right side nearest thereto.

The majority state "it would seem quite certain that the first impact occurred when the deceased was still mounted on his machine and still seated in the saddle," and that "We may doubtless infer from the condition of the *rear wheel* of the bicycle that the first impact occurred there." I concur in those two conclusions. To me it is obvious that the conclusions of the majority cannot be reconciled with the defendant's testimony that the bicycle was almost at right angles with the car. Had it been in the position defendant said it was, the first impact would have been from the side and not the rear and the side of the bicycle would have received the impact and not the "rear wheel." If the majority are correct in their finding just above quoted, and I agree that they are, then the direct evidence of defendant cannot be true.

According to the defendant, deceased was proceeding west along the north side of the highway, and at the first honk of the horn, he looked around, turned south, went across the road a distance of 15 to 20 feet, then proceeded west, then (at the sound of the second honk when the defendant was 10 to 20 feet from him) turned abruptly north, proceeding almost at right angles to the course of defendant's car. The story might test the credulity of a jury in the light of the speed of the car, the distances fixed by the defendant, the instinct of a person for safety and self-preservation, and the lack of probability that the deceased would have turned at a right angle, deliberately crossing into the path of a car that he knew was closely approaching. The evidence presents a jury question.

The judgment should be reversed and the cause remanded for further proceedings.

ROSE, J., joins in the dissent.

PAINE, J., dissenting.

I join with Judge Rose in concurring in the dissent filed by the chief justice.

This is a very close case, as shown by the fact that it was argued to our court the first time on May 22, 1940, the second time on October 9, 1940, and the third time on May

19, 1941, with the present opinion supported by only four members of the court.

Aside from the testimony of the witnesses, a vital piece of evidence is the condition of the bicycle. If the defendant's story is true, the boy, Albert, turned directly at right-angles and started to cross, and was directly in front of defendant's automobile, and was struck with his right side toward the car. If the bumper had struck the bicycle length-wise, the rear wheel could not have been the only part of the bicycle damaged. That evidence of the defendant is not supported by the physical facts, for the rear wheel of the bicycle was crushed in by the bumper or fender striking it a blow directly from behind. The front part of the bicycle was not damaged in any way. This proves that the boy was going down the road in a place where he had a right to be, and was overhauled from behind by the fast-moving automobile, which did not turn out far enough, and crashed into him.

The testimony of Dr. C. G. McMahon, who treated Albert for the few hours before his death in the Superior hospital, is to the effect that they immediately took him to the X-ray room, and his principal injuries were on the left side, with a fracture of his left collar bone and two broken ribs on the left side, and a crushed chest. This would convince any jury that he was struck from the rear and left side, while, on the other hand, if he had been crossing directly in front of the car, and his bicycle had been struck by the bumper or fender, it would have been damaged lengthwise, and Albert would have been thrown onto the hood, and his broken ribs and broken collar bone would doubtless have been on his right side, and not on his left side.