**MARYLAND CAS. CO. v. INDEPENDENT METAL PRODUCTS CO. et al.**

**Civ. A. No. 43–50.**

United States District Court
D. Nebraska, Omaha Division.

Sept. 8, 1951.

Edson Smith, of the firm of Swarr, May, Royce, Smith & Story, Omaha, Neb., for plaintiff.

Louis E. Lipp, of White & Lipp, Omaha, Neb., for defendants.

864

DONOHOE, Chief Judge.

This action is for recovery of disbursements made by plaintiff, Maryland Casualty Company, a Maryland corportion, to satisfy the liability of its insured, Fruehauf Trailer Company, arising out of the latter's breach of an implied warranty ·of fitness of a petroleum transportation trailer sold to Gilmore, Gardner and Kirk Oil Company, a part of which trailer had been fabricated by the defendant, Independent Metal Products Company, now a Nebraska corporation, and formerly a partnership, all the members of which were, and are now, citizens of the state of Nebraska. This Court has jurisdiction since the matter in controversy exceeds $3,000, exclusive of interest and costs, and is between citizens of different states. 28 U.S.C.A. § 1332. The trial was had to the Court without the aid of a jury, and after careful consideration of all the material evidence adduced at the proceedings, the Court makes the following special

Findings of Fact.

The Fruehauf Trailer Company is the world's largest manufacturer and distributor of truck trailers and special bodies and maintains numerous plants throughout the country for the manufacture, assembly and distribution of such vehicles. Among the types of bodies manufactured and assembled by Fruehauf are trailers bearing tanks or vessels to be used in the transportation of fluids, gaseous and powdered commodities.

In addition to the manufacture of such tank trailers in its own plants and factories, the Fruehauf Company has contracted a portion of such work to the defendant partnership, and its successor corporation, Independent Metal Products Company. Fruehauf maintains and operates a tank trailer assembly plant in the city of Omaha, Nebraska; and contiguous to, joining with, and opening into this Fruehauf plant is the plant of the defendant wherein the defendant fabricates and attaches vessels and tanks for Fruehauf.

A course of dealing has been established between Fruehauf and defendant whereby Fruehauf manufactures and assembles the undercarriage or chassis of the trailer, including wheels, tires and other equipment. This undercarriage is then moved to the defendant's plant for the purpose of mounting thereon a tank or vessel fabricated by the defendant.

These tanks are designed by the Fruehauf Company and constructed by the defendant pursuant to written orders from Fruehauf, setting forth the specifications for each tank. The defendant has no discretion in regard to the design of the tank, its size, material, accessories or methods of manufacture, but is required to follow instructions from Fruehauf's engineers who submit to the defendant complete work data sheets, instructions, drawings and specifications. The defendant, in constructing the tank, uses substantially the same methods of procedure used by Fruehauf in its own plants, where Fruehauf manufactures not only the undercarriage, but also the tank which is mounted thereon.

The tanks are constructed in the following manner. Sheets of nickel alloy steel are shaped into the periphery of the tank, which is substantially an ellipsoidal solid, closed at both ends, with a cut out portion toward the front where the tank trailer is attached to the tractor. The metal sheets are welded together, interior vertical braces are inserted to support and strengthen the vessel and oftentimes baffle plates are spaced throughout the tank to eliminate the surging of a contained liquid when the vessel is in motion. All the welding in connection with this construction is done with the tank in an upside down position. When the work is complete the tank is turned right side up and a hole approximately twelve by sixteen inches is cut in the top of the tank. Workmen, of necessity small in stature, go through this hole for the purpose of cleaning the inside of the tank. This cleaning includes using a chip drill on the seams of the tank, sweeping the tank out with brooms and vacuum cleaners and finally painting the seams.

In spite of the interior cleaning by the tank cleaners, frequently pieces of welding rod, metal or other foreign material lodge in the seams and when jarred loose will work their way into the bottom of the tank

and ultimately into the dispensing valves thereby scoring or preventing proper operation of these valves. The presence of foreign material in the tank, after cleaning, is sufficiently frequent to be considered a recognized hazard in the tank manufacturing industry. Mr. Owens, an officer and employee of the Fruehauf Company, who had considerable experience in the tank trailer manufacturing industry, testified that he knew of no technique which would insure that the work of the inside cleaners would remove all foreign material from the tank.

This foreign material could be kept from entering and possibly damaging the valve by the use of a device known as a line strainer, which is nothing more than a mesh or screen placed in the pipes just ahead of the valve. The Fruehauf Company was well aware of this device and frequently specified its installation on tanks constructed by the defendant; but the defendant did not have discretion to add this device without a written request from Fruehauf.

Fruehauf employed one Phelps for the purpose of inspecting work done by the defendant. Phelps checked through the assembly line every day and had knowledge of the condition of the tanks from the time their assembly commenced until they were finally accepted. The completed tanks were not accepted for Fruehauf by Phelps until he had made a reasonably extensive inspection, which lasted approximately forty minutes and included an examination of the interior of the tank. In the course of this inspection Phelps would open the fill caps, eight or ten inch openings in the top of the tank, and, using either sunlight or a battery flash light for illumination, he would examine the interior to determine whether or not any foreign material had been left in the bottom of the tank. He would also see that "the plugs heads were built in", that "the baffle plates were in place" and that all the necessary valves, manifolds and so forth that "the order called for were attached to the vessel". If Phelps found foreign material in the tank he could and would refuse to accept the tank for Fruehauf. The inspection which

Phelps actually made might not ordinarily disclose all the foreign material that could possibly be lodged behind the baffle plates or in other obscure places. However, the Fruehauf Company determined the nature and extent of its own inspection without any limitation by defendant, and with full opportunity to make as thorough an inspection as Fruehauf desired.

In addition to Phelps, Owens and Thomas, also employees of Fruehauf, went through the defendant's plant on many occasions throughout the period in question; and if they were not satisfied with the methods used in assembling the tanks, or if a particular tank was in some way unfit, they would see that the appropriate changes were made.

The entire output of the defendant, approximately eight tanks a week, was purchased by Fruehauf, subject of course, to the inspection and acceptance already mentioned.

On April 21, 1951, Fruehauf ordered from the defendant sixty, 4000 gallon, Hi-Tensile, three compartment tanks, to be made according to specifications set forth on a data sheet furnished by Fruehauf. These tanks were to be stock items, i.e. tanks made up by the defendant for Fruehauf, though not yet ordered from Fruehauf by a third party. The original order, calling for two-inch piping on all sixty of the tanks, was modified by a letter from Fruehauf, dated April 22, 1942, which specified that twenty of the units, serial numbers T.D. 1404 through T.D. 1424, were "to be built up with 3" piping". On October 6, 1942, one of these twenty tanks, serial number T.D. 1417, was delivered to Fruehauf by the defendant, and accepted, after inspection, by Mr. Phelps on behalf of Fruehauf. This tank was furnished by the defendant to Fruehauf pursuant to a sales contract containing the following express warranty or guarantee: "Guarantee. The seller guarantees all products of its manufacture to be free from defects of workmanship and material for a period of one year from the date of delivery. The obligation of the seller under this guarantee shall be limited, however, to the repair or replacement at our plant in Omaha, Ne-

braska, of any goods so proving defective, and shall not render the seller liable for any other or consequential damages to the buyer or to any other person."

This tank remained in Fruehauf's possession until October 22, 1942. It was then returned to the defendant for the purpose of adding an eleven-inch tire carrier under the tank and a three-inch manifold on the discharge valves. Mr. Owens testified that it was very improbable that the work done in connection with these changes would introduce any foreign material, such as a piece of welding rod, into the tank or pipes. On October 29, 1942, the tank trailer, with tire carrier and manifold added, was returned to Fruehauf. It was sold by Fruehauf to a partnership known as the Gilmore, Gardner and Kirk Oil Company and delivered to the partnership in Omaha, Nebraska, November 11, 1942.

On December 10, 1942, the Oil Company made a delivery of gasoline from the tank trailer to the Oklahoma Transportation Company in Oklahoma City, Oklahoma. An excessive delivery was made, and the gasoline overflowed onto the floor of the garage. This gasoline ignited and the resulting fire caused serious injuries to one James E. Walker and substantial property damage. A contributing cause of the fire and the resulting damage was the presence of a small piece of welding rod approximately two inches in length and one-eighth of an inch in diameter in the gate valve through which the front compartment of the tank trailer discharged into the manifold, which prevented the complete closing of the valve, and resulted in the excessive delivery. It is undisputed that the piece of welding rod was in the tank on November 11, 1942.

Walker sued Gilmore, Gardner and Kirk Oil Company and his case was settled by the entry of a judgment in his favor in the amount of $3,000, and the payment of the same by the Central Surety and Insurance Corporation with whom the Oil Company carried their insurance. The property damage cases were contested and resulted in verdicts for the Oil Company, but since the suits were for amounts totaling more than the Oil Company's liability insurance policy limits, that company employed its own attorney and paid him $1,500 for his services.

The Oil Company and the Central Surety and Insurance Company brought suit against Fruehauf in the United States District Court in Oklahoma City to recover the amounts paid in settlement of the Walker judgment and for the attorney's fees mentioned. Fruehauf at all stages of the litigation notified the defendant, Independent Metal Products Company, of the filing of the suit and demanded that the defendant hold it harmless from any loss arising out of said action and tendered the defense of the action to Independent Metal Products Company, advising the latter concern that if it did not assume the defense, Fruehauf would do so, and would hold Independent liable for any judgment, attorneys' fees and expenses incurred in connection with the matter, but the defendants refused to undertake the defense.

A trial was had which resulted in a judgment in favor of the Oil Company and the Central Surety and Insurance Company against Fruehauf. This judgment was affirmed on appeal by the United States Court of Appeals, Fruehauf Trailer Co. v. Gilmore, Gardner & Kirk, 10 Cir., 1948, 167 F.2d 324, on the ground that there was an implied warranty on the part of Fruehauf that the tank trailer was reasonably fit for the purpose of transporting and delivering gasoline, and that the failure to remove the welding rod from the front compartment of the tank was a breach of that implied warranty for which the Insurance Company and the Oil Company were entitled to recover.

During all times material to this action, there was in full force and effect a policy of insurance whereby the plaintiff in this case, Maryland Casualty Company, insured the Fruehauf Trailer Company and was obligated to defend Fruehauf against such suits as the one heretofore mentioned and to pay any judgment obtained against Fruehauf in such action. The policy also provided that "in the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor." The plaintiff's total

disbursements to defend the suit and satisfy the judgment against Fruehauf amounted to $7,048.81. As subrogee of the Fruehauf Trailer Company the plaintiff now seeks to recover this amount from the defendant, Independent Metal Products Company.

## Discussion

■ Counsel for plaintiff has proceeded in the trial of this case on the theory that defendant is liable (1) in tort for negligence, or (2) in contract for breach of an implied warranty of fitness.[1] The evidence fails to convince the Court that the defendant is culpable on either ground.

■ The defendant was both the manufacturer and vendor of the tank portion of the tank trailer from which the excessive delivery of gasoline was made, thereby causing injuries. This excessive flow of gasoline resulted from the presence of a small piece of welding rod in one of the discharge valves of the tank which prevented the valve from completely closing. The fact is clear that the piece of welding rod was in the tank on November 11, 1942, when the tank was delivered by Fruehauf to Gilmore, Gardner and Kirk Oil Company. However, the Court is not persuaded that the piece of welding rod was introduced into the tank by the defendant, or, that it was even present in the tank when the defendant delivered the tank to Fruehauf. The presence of the welding rod in the tank on November 11, 1942, does not create a presumption that it was there at an earlier date, but is merely evidential of this fact. Liverpool & London & Globe Insurance Co. v. Nebraska Storage Warehouses, 8 Cir., 1928, 96 F.2d 30, 36. Since there is no direct evidence on the issues of how or when the piece of welding rod was introduced into the tank, plaintiff must rely on circumstantial evidence to establish these facts. The conclusion that defendant introduced the piece of welding rod into the tank, or that it was present in the tank when the tank was delivered by defendant

to Fruehauf is not, under the view taken by some authorities, supported by circumstantial evidence, unless the facts relied upon are of such a nature and so related to each other that no other conclusion can reasonably be drawn from them. Bixby v. Ayers, 139 Neb. 652, 662, 298 N.W. 533; Mescall v. W. T. Grant Co., 7 Cir., 1943, 133 F.2d 209. And even under the more liberal view, the conclusion, to be supported by circumstantial evidence, must be the more probable · hypothesis to be drawn from the proven circumstances. 32 C.J.S., Evidence, § 1039, p. 1103, n. 28. Defendant finished all welding operations in connection with the interior of the tank on October 6, 1942, and delivered the tank to Fruehauf on this date. The tank trailer was returned to defendant October 27, 1942, and kept by it through October 30, 1942, for the purpose of adding a manifold and tire carrier; but in view of the testimony of plaintiff's witness, Mr. Owens, to the effect that it is highly improbable that the piece of welding rod could have been deposited in the tank or valves in the process of making these changes, the Court is inclined to the view that the piece of welding rod was not injected in the tank during this period. With the exception of this four-day period, the tank was in the possession of Fruehauf for more than thirty days prior to the date that the piece of welding rod was admittedly present in the tank. Neither plaintiff, the subrogee of Fruehauf, nor defendant, has introduced evidence which sufficiently shows where the tank trailer was kept during that period and what if anything was done to it. Under these circumstances, the Court cannot conclude, without engaging in speculation, that the piece of welding rod admittedly present in the tank on November 11, 1942, was present in the tank on or before October 6, 1942, or that it was introduced into the tank by defendant, Independent Metal Products Company; such conclusions are not necessarily the more probable to be

---

1. Under the modern view a warranty is regarded as a term of the contract of sale, express or implied, for which the remedy is a contract action. However, the court recognizes that in its beginning the liability was based on tort and the action was on the case. 1 Williston on Sales (2d Ed.) Sec. 197; Ames, History of Assumpsit, 2 Har.L.R. 1, 8.

drawn from the proven circumstances and are certainly not the only conclusions that can fairly and reasonably be drawn from such circumstances.

For purposes of discussion only, and so that all the issues presented at the trial may be completely disposed of, the Court will assume to be the fact that which in the foregoing paragraph, has expressly been declared not to be the fact, i. e. that the piece of welding rod was present in the tank prior to October 6, 1942.

## 1. Negligence.

It may be stated as a general rule that a manufacturer is required to exercise reasonable care in manufacturing an article which, if carelessly manufactured, is likely to cause more than trivial harm to those who use it in the manner for which it is manufactured. Restatement, Torts (1934 Ed.) Section 395. However, the defendant is only required to exercise reasonable care and the burden is on plaintiff to show that the defendant has failed to exercise such care in one or more of the particulars in which reasonable care is required for the protection of those whose safety depends upon the character of the chattel. The Court is not convinced that the defendant failed to exercise the care required.

"The particulars in which reasonable care is usually necessary for protection of those whose safety depends upon the character of the chattels are, (1) the adoption of a formula or plan which, if properly followed, will produce an article safe for the use for which it is sold, (2) the selection of material and parts to be incorporated in the finished article, (3) the fabrication of the article by every member of the operative staff no matter how high or low his position therein, (4) making such inspections and tests during the course of manufacture and after the article is completed as the manufacturer should recognize as reasonably necessary to secure the production of a safe article, and (5) the packing of the article so as to be safe for those who must be expected to unpack it." Restatement of Torts, Section 395, Comment C.

The defendant cannot be said to have failed to exercise care in the first particular mentioned above because, in general, Fruehauf, and not defendant, determined the design and specifications of the chattel and also the methods and modes of manufacture. In regard to particular number 2, there is neither allegation nor evidence that the defendant failed to use care in selecting the materials to be incorporated in the tank trailer. The difficult question arises in connection with particular number 3. Every member of the defendant's operative staff was required to use reasonable care in the fabrication of the tank trailer. Does the fact, which has been assumed for the purposes of discussion, that a piece of welding rod approximately two inches in length and one-eighth of an inch in diameter was present somewhere in the tank when it was delivered by defendant to Fruehauf show that some member of the defendant's operative staff failed to use reasonable care in his work on the tank? The Court is of the opinion that this fact, in and of itself, does not convincingly establish that defendant's employees failed to use due care. To hold otherwise, the Court would have to assume that if all the defendant's employees exercised reasonable care in manufacturing the tank trailer according to the specifications and in the manner suggested by Fruehauf that the piece of welding rod would not have been overlooked. This assumption does not seem to be in harmony with the testimony of the plaintiff's own witness, Mr. Owens. He stated that in spite of all the cleaning of the interior of the tank by the defendant's clean up boys, frequently pieces of metal and foreign material lodged in the braces or baffle plates and that presence of foreign material in the tank was frequent enough to be a recognized hazard in the industry and that he knew of no procedure which would insure that the sweeping and cleaning would remove all foreign material from the tank. As to the fourth particular, which requires making such inspections and tests during the course of manufacture and after the article is completed as the manufacturer should recognize as reasonably necessary for the produc-

tion of a safe article, the Court is unable to find that the defendant was·negligent in this respect. Particular number 5, which has reference to the packing of the article so as to be safe for those who must be expected to unpack it, is not material to the present case.

■ Not only is the Court not convinced of the defendant's failure to use due care, but even if the Court were convinced, it would still be dubious of the plaintiff's right to restitution. The applicable rule is this: "Where a person has supplied to another a chattel which because of the supplier's negligence or other fault is dangerously defective for the use for which it is supplied and both have become liable in tort to a third person injured by such use, the supplier is under a duty to indemnify the other for expenditures properly made in the discharge of the claim of the third person, if the other disposed of the chattel in reliance upon the seller's care and if such reliance was justifiable." Restatement, Restitution (1937 Ed.) Section 93 (1). The plaintiff, a subrogee of Fruehauf, must stand in the shoes of Fruehauf. Fruehauf suggested methods of manufacture and the defendant complied with these suggestions. Fruehauf's agents were continually in defendant's plant observing the processes of manufacture and knew the condition of each tank from beginning to end. Upon completion of each tank Fruehauf made a thorough inspection of it before accepting the tank from the defendant. Under these circumstances, the Court is unable to find that Fruehauf justifiably relied upon the defendant's care.

In concluding the discussion of negligence, the Court feels obliged to mention one last fact. Fruehauf was well aware of the possibility that foreign material could have lodged in the tank. Fruehauf could have discovered the presence of this matter by a more detailed inspection or could have prevented the consequences resulting from its presence by authorizing the installation of a line strainer which would have kept this harmful substance from reaching the valves.

## 2. Implied Warranty

■ The plaintiff strenuously contends that the defendant's delivery of the tank, with the piece of welding rod therein, to Fruehauf, constituted the breach of an implied warranty of fitness.[2] The Court, however, is unable to find any such implied warranty. Under the Uniform Sales Act as adopted in Nebraska, the general rule is that there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale. Section 69–415, R.R.S.Neb., 1943. There are, of course, several exceptions to this general rule, but the case under consideration does not come within the purview of any of these exceptions.

■ The broadest of such exceptions may be stated as follows: "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." Section 69–415 (1), R.R.S.Neb.1943. In this case there is no implied warranty of fitness under the quoted section of the statute for the following reasons. The fitness of an article for the performance of a particular function depends generally upon three basic factors: (1) design (including 'specification of material), (2) materials, and (3) workmanship. In other words, the article must be designed to perform the desired function; it must be made out of specified materials which are not defective and these materials must be assembled according to the plan or design in a careful and workmanlike manner. In the case under consideration, Fruehauf, the buyer, designed the tank trailer and specified the materials to be used in its construc-

---

**2.** Here again the court is assuming for the purposes of discussion, that which the evidence does not establish to be the fact, i. e. the presence of the welding rod in the tank on or before October 6, 1942.

tion. For this reason, there could be no implied warranty that the tank trailer was designed to perform a particular function because Fruehauf, the buyer, did not rely upon the skill or judgment of the defendant, the seller, in this matter.[3] Nor can the Court imply that the defendant warranted the fitness of the tank with respect to materials and workmanship. It is well settled that where express warranties in a contract are in their nature inconsistent with warranties which would have been implied, it would indeed be violating the intention of the parties to imply warranties. I Williston on Sales (1948 Ed.) Sec. 293 a, p. 625, n. 18; Annotation 164 A.L.R. 1337; cf. Section 69–415 (6), R.R.S.Neb.1943. The sales contract in this case guaranteed that the tank would be free from defects of workmanship and material for a period of one year from the date of delivery. The guarantee, however, limited the obligation of the seller thereunder to the repair or replacement of any goods so proving defective and explicitly provided that "this guarantee shall not render the seller liable for any other or consequential damages to the buyer or any other person." This express warranty specifically covering the matters of materials and workmanship, and limiting the defendant's liability with respect thereto, is inconsistent with and precludes an implied warranty touching the same matters.

 The second exception to the general rule that no warranty of quality should be implied relates to the implied warranty of merchantable quality, Sec. 69–415 (2), R.R.S.Neb.1943, and is not material to the disposition of the present case. The last exception which need be mentioned is that an implied warranty as to quality or fitness for a particular purpose may be annexed by usage of trade. Sec. 69–415 (5), Neb. R.R.S.1943. However, the plaintiff does not contend, nor is there any evidence to substantiate a finding, that an implied warranty of fitness was, in this case, annexed by usage of trade.

3. Under the Sales Act the buyer's justifiable reliance on the seller's skill and judgment is alone important. 1 Willis-

 To conclude the discussion of warranties, the Court calls attention to the proposition that if the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed. Sec. 69–415 (3), Neb.R.R.S.1943. However, the Court does not want to indulge in a discussion as to whether or not Mr. Phelps' inspection ought to have revealed the presence of the piece of welding rod upon the assumption that the welding rod was somewhere in the tank when Phelps made his inspection, since such a discussion would lead us too far from the realities of the situation. Suffice it to say, that the evidence does not establish that the piece of welding rod was even in the tank when Mr. Phelps made his inspection and accepted delivery of the tank on behalf of Fruehauf.

For the reasons stated in the foregoing memorandum, plaintiff's cause of action should be dismissed. Counsel for defendant shall prepare and submit for approval the appropriate judgment to be entered in accordance with this memorandum.

ton on Sales (1948 Ed.) Sec. 235, pp. 609, 610, note 14.